No. 2013-5091

# In The United States Court of Appeals For The Federal Circuit

MARY V. SIEBEN,

*Plaintiff-Appellant,*

v.

UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States Court of Federal Claims
in case no. 11-CV-0878, Judge Edward J. Damich.

**BRIEF OF PLAINTIFF-APPELLANT MARY V. SIEBEN**

Harry A. Sieben, Jr.
SIEBEN, GROSE, VON HOLTUM &
CAREY
901 Marquette Avenue, Suite 500
Minneapolis, MN 55402-3205
(612) 333-9781

*Attorney for Plaintiff-Appellant
Mary V. Sieben*

July 19, 2013

2013 – BACHMAN LEGAL PRINTING – FAX (612) 337-8053 – PHONE (612) 339-9518 or 1-800-715-3582

## <u>CERTIFICATE OF INTEREST</u>

       Pursuant to Federal Circuit Rule 47.4, counsel for Plaintiff-Appellant, Mary V. Sieben certifies the following:

1.     The full name of every party or amicus represented by me is:

     Mary V. Sieben

2.     The name of the real party in interest represented by me is:

     Mary V. Sieben

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

     Harry A. Sieben, Jr., Sieben Grose Von Holtum & Carey, Ltd., 901 Marquette Avenue, Suite 500, Minneapolis, MN  55402-3205.

Dated:  July 19, 2013         /s/ Harry A. Sieben, Jr.         
                               Harry A. Sieben, Jr.

                               *Attorney for Plaintiff-Appellant*
                               *Mary V. Sieben*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................vi

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ......................................................................2

STATEMENT OF THE CASE ................................................................3

STATEMENT OF THE FACTS ..............................................................4

I.     Ms. Sieben, a highly decorated former Air Force Colonel, suffered
several disabling injuries during her tour of duty in Iraq in 2004 .................4

     A.     Ms. Sieben suffered a serious spinal injury while on duty
in Iraq .........................................................................................5

     B.     Ms. Sieben suffers from PTSD as a result of her tour of duty
in Iraq .........................................................................................6

     C.     Ms. Sieben incurred traumatic brain injury while on duty
in Iraq .........................................................................................7

     D.     Because of Ms. Sieben's service-related injuries, she has been
unable to follow a substantially gainful occupation ...........................8

II.     After returning from Iraq, Ms. Sieben was placed into the disability
evaluation system due to her combat-related injuries ...................................9

     A.     The Medical Evaluation Board evaluated Ms. Sieben and entered
her into the Air Force's disability system ...........................................9

     B.     In 2006, the Physical Evaluation Board found Ms. Sieben
100 percent disabled due to her service-related injury and placed
her on the temporary disability retired list .........................................10

C.     From 2006 until 2009, Ms. Sieben was on the temporary
       disability retired list where the Air Force maintained a rating of
       100% disabled .....................................................................................11

III.   In 2009, Ms. Sieben underwent two Air Force directed medical
       evaluations ..........................................................................................12

       A.     Dr. Barr agreed with all previous tests and exams in finding
              that Ms. Sieben suffers from serious service-related spinal
              injuries .........................................................................................12

       B.     Capt. Garza downplayed Ms. Sieben's service-related injuries,
              but did not opine that she would be able to engage in substantially
              gainful occupation ........................................................................13

IV.    Based only on Capt. Garza's report—which did not address whether Ms.
       Sieben could engage in a substantially gainful occupation—the Air Force
       decreased Ms. Sieben's disability rating to 20 percent and did not rate her
       PTSD or traumatic brain injury ......................................................14

       A.     Based only on Capt. Garza's report, the Informal Physical
              Evaluation Board rated Ms. Sieben 10 percent disabled ...................14

       B.     Capt. Garza's report was the only medical evidence the
              Formal Physical Evaluation Board relied on to rate Ms. Sieben
              10 percent disabled without considering her PTSD or traumatic
              brain injury ..................................................................................19

       C.     The Secretary of Air Force Personnel Council increased Ms.
              Sieben's disability rating to 20 percent but ignored her request
              to be rated under Section 4.16(b) and did not rate PTSD or
              traumatic brain injury ...................................................................22

V.     The Court of Federal Claims appeared to agree that Ms. Sieben's
       disability rating was improper, but deferred to the Air Force's
       decision ...............................................................................................23

SUMMARY OF THE ARGUMENT ...................................................................24

ARGUMENT ................................................................................................25

I.      Standard of Review.....................................................................................25

II.    The Air Force erred as a matter of law when it failed to apply the correct legal standard to determine Ms. Sieben's disability rating .........................26

      A.     The plain language of 10 U.S.C. § 1216A requires the Air Force to apply a "substantially gainful occupation" standard when rating Ms. Sieben's disabilities ...........................................................26

      B.     The Air Force erred as a matter of law by requiring "total disability" and "unemployability" instead of an inability to follow a "substantially gainful occupation."......................................28

      C.     Applying the proper legal standard, the evidence exclusively establishes that Ms. Sieben is unable to engage in a substantially gainful occupation...........................................................30

      D.     Capt. Garza's report does not alter the conclusion that Ms. Sieben is unable to engage in a substantially gainful occupation.......31

      E.     Ms. Sieben requests that this Court reverse the Air Force's rejection of her claim for disability, or alternatively, remand for a correct determination of her disability rating under the correct legal standard......................................................................................34

III.   The Air Force violated Ms. Sieben's right to due process under the Fifth Amendment and 10 U.S.C. § 1214 when it relied on an incomplete and altered record to determine her disability rating.....................................35

      A.     Ms. Sieben has a right to due process ................................................35

      B.     Ms. Sieben was denied due process because a material and favorable medical record was altered..................................................36

C.  Ms. Sieben was denied due process because the Air Force
    provided incomplete evidence of PTSD and traumatic brain
    injury and therefore failed to consider these conditions when
    it rated her disabilities ........................................................................ 37

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

## CASES

Adkins v. United States,
68 F.3d 1317 (Fed. Cir. 1995)...................................................................25

Beaty v. Brown,
6 Vet App. 532 (1994) .....................................................................28, 29

Brickwood Contrs., Inc. v. United States,
288 F.3d 1371 (Fed. Cir. 2002) .............................................................34

Cathell v. Brown,
8 Vet. App. 539 (1996) .........................................................................29

Chambers v. United States,
417 F.3d 1218 (Fed. Cir. 2005)...............................................................25

Comer v. Peake,
552 F.3d 1362 (Fed. Cir. 2009)...............................................................26

Cushman v. Shinseki,
576 F. 3d 1290 (Fed. Cir. 2009).....................................2, 24, 35, 36, 37

Gleicher v. Derwinski,
2 Vet. App. 26 (1991) ...........................................................................29

Grillo v. Caughlin,
31 F.3d 53 (2d Cir. 1994).......................................................................36

McHenry v. United States,
367 F.3d 1370 (Fed. Cir. 2004)....................................................25, 27, 29

Moore v. Derwinski,
1 Vet. App. 356 (Vet. App. 1991) ....................................................28, 34

Murphy v. United States,
993 F.2d 871 (Fed. Cir. 1993)......................................................25, 26, 37

vi

Peterson v. Shinseki,
2012 U.S. App. Vet. Claims LEXIS 747 (April 18, 2012) .....................................34

Roth v. United States,
378 F.3d 1371 (Fed. Cir. 2004) .............................................................................25

Roberson v. Principi,
251 F.3d 1378 (Fed. Cir. 2001).......................................................................28, 34

Sargisson v. United States,
913 F.2d 918 (Fed. Cir. 1990).................................................................................37

Sawyer v. United States,
930 F.2d 1577 (Fed. Cir. 1991)........................................................................35, 36

SKF USA, Inc. v. U.S. Customs & Border Prot.,
556 F.3d 1337 (Fed. Cir. 2009)...............................................................................25

Stemler v. City of Florence,
126 F.3d 856 (6th Cir. 1997) .................................................................................36

U.S. Shoe Corp. v. United States,
296 F.3d 1378 (Fed. Cir. 2002)...............................................................................25

Wagner v. United States,
365 F.3d 1358 (Fed. Cir. 2004) ..............................................................................40

Wolf v. United States,
168 Ct. Cl. 24 (Ct. Cl. 1964) .................................................................................29

## STATUTES AND RULES

10 U.S.C. §§ 1201-1222  ..........................................................................................1

10 U.S.C. § 1201 ...........................................................................10, 11, 23, 27, 35

10 U.S.C. § 1203 .....................................................................................................10

10 U.S.C. § 1209 .....................................................................................................23

10 U.S.C. § 1210 ....................................................................................11

10 U.S.C. § 1214 ....................................................................2, 19, 35, 36

10 U.S.C. § 1216A .............................................................................*passim*

28 U.S.C. § 1295(a)(3) .............................................................................1

28 U.S.C. § 1491 ......................................................................................1

38 C.F.R. § 4.1 .................................................................................27, 38

38 C.F.R. § 4.3 ........................................................................................31

38 C.F.R. § 4.7 ........................................................................................ 31

38 C.F.R. § 4.16 ................................................................................*passim*

Federal Circuit Rule 47.5 .........................................................................1

## OTHER AUTHORITIES

153 Cong. Rec. 15347 (2007) .................................................................27

Air Force Instruction No. 36-3212, Physical Evaluation for Retention,
Retirement, and Separation (Feb. 2, 2006) (Incorporating Through
Change 2, Nov. 27, 2009) ..........................................................11, 32, 37

DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 97 (32nd ed. 2012) ..................13

Dep't of Defense Instruction 1332.38, Physical Disability Evaluation
(Nov. 14, 1996) ...............................................................................*passim*

National Defense Authorization Act for Fiscal Year 2008,
Pub. L. No.110-181.................................................................................27

Policy Memorandum on Implementing Disability-Related Provisions
of the National Defense Authorization Act of 2008, Pub. L. 110-181
(Oct. 14, 2008) .........................................................................11, 37

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), no appeal from this same civil action or proceeding in the U.S. Federal Court of Claims was previously before this or any other appellate court. Pursuant to Federal Circuit Rule 47.5(b), there is no case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The U.S. Court of Federal Claims had jurisdiction over this military disability retirement case pursuant to the Tucker Act, 28 U.S.C. § 1491 and 10 U.S.C. §§ 1201-1222. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

1.      When a service member's injuries are so disabling they prevent her from following a "substantially gainful occupation," she must be rated 100 percent disabled. 10 U.S.C. § 1216A(a)(1)(A); 38 C.F.R. § 4.16(b). The Air Force and Court of Claims ignored this mandatory legal standard and instead required Ms. Sieben to show "total disability" in order to be found "unemployable." A438; A14-15. Did the Air Force and Court of Claims err as a matter of law when they rejected the correct legal standard—unable to follow a "substantially gainful occupation"—in favor of a stricter standard—the requirement of "total disability" and "unemployability"?

2.      The government violates a service member's right to due process when it denies disability benefits based on an altered or incomplete medical record. Cushman v. Shinseki, 576 F.3d 1290, 1299 (Fed. Cir. 2009); 10 U.S.C. § 1214. Here, the Air Force altered material, favorable evidence that was then not considered during Ms. Sieben's request for a disability retirement. In addition, the Air Force is required to provide a comprehensive physical examination to account for all conditions that might entitle a veteran to a disability retirement. 10 U.S.C. § 1216A(b). Here, the Air Force failed to evaluate Ms. Sieben's PTSD and traumatic brain injury, leaving her medical record incomplete without the evidence necessary to rate these disabilities. Was Ms. Sieben deprived of due process?

## STATEMENT OF THE CASE

In December 2004, Ms. Sieben returned from Iraq. A876. On November 5, 2005, she met with the Medical Evaluation Board, which referred her to the Physical Evaluation Board. A831. On February 22, 2006, Ms. Sieben met with a Formal Physical Evaluation Board, which determined her spinal injury merited a disability rating of 100 percent due to unemployability and placed her on the temporary disability retired list. A746-47. On May 22, 2008, she underwent a temporary disability retired list physical exam, the results of which were sent to another Physical Evaluation Board. A672-75. On July 10, 2008, the Physical Evaluation Board again rated Ms. Sieben 100 percent disabled due to unemployability, and kept her on the temporary disability retired list. A667-68. In September 2009, Ms. Sieben underwent two temporary disability retired list physical examinations. A611-13; A619-21. On January 20, 2010, the Informal Physical Evaluation Board rated her 10 percent disabled for her spinal injuries. A598. The Informal Physical Evaluation Board did not consider her other disabilities. A598. On June 7, 2010, the Formal Physical Evaluation Board again rated Ms. Sieben 10 percent disabled for spinal injuries only. A434-38. On appeal, the Secretary of the Air Force ignored Ms. Sieben's request to be rated under 38 C.F.R. § 4.16(b) due to her inability to follow a substantially gainful occupation and declined to rate her PTSD and traumatic brain injury due to a lack of evidence,

but increased her rating for her spinal injuries to 20 percent disabled. A33-35. On

March 31, 2011, Ms. Sieben was placed in the inactive reserve without separation

pay, disability retirement, benefits, or medical care. A30. Ms. Sieben filed this

action in the U.S. Court of Federal Claims on December 14, 2011. The Court of

Federal Claims granted the government's motion for judgment on the

administrative record on March 15, 2013 and denied Ms. Sieben's cross-motion for

judgment on the administrative record. A1-19. This timely appeal followed.

## STATEMENT OF THE FACTS

I.     <u>Ms. Sieben, a highly decorated former Air Force Colonel, suffered several disabling injuries during her tour of duty in Iraq in 2004.</u>

Ms. Sieben is a highly decorated former Air Force Colonel with 27 years of

experience on active duty in the Air Force Reserve and Air National Guard. A737.

She holds a bachelor's degree in nursing and chemistry, a master's degree in

strategic intelligence with an emphasis on the Mideast, and a law degree from

Cornell Law School. A514. During her nearly three decades of military service,

Ms. Sieben served as a nurse, judge advocate, intelligence officer, and a strategic

planner at the Pentagon. A122; A213; A303.

After volunteering to serve in Iraq in 2004, Ms. Sieben served with the U.S.

Army, moving around Iraq in order to meet with Army leadership, Iraqis, and

others involved in the reconstruction effort. A54; A761. Traveling by C-130

aircraft, helicopter, or convoy, Ms. Sieben was regularly exposed to mortar and

rocket attacks while on the ground and small arms fire while in the air. A54; A151-52; A225; A436. Due to the constant threat, Ms. Sieben and her colleagues were required to wear heavy body armor and carry a weapon at all times. A54; A151.

A.      Ms. Sieben suffered a serious spinal injury while on duty in Iraq.

In the fall of 2004, Ms. Sieben was injured when the C-130 aircraft transporting her and others was forced to land in complete darkness due to an insurgent threat in the area. A54; A484; A486. After ensuring people and equipment were off the aircraft, with engines still running, she exited the aircraft, running down the rear ramp. A54; A484; A486. Because of the total darkness, however, she was unaware that the loadmaster had begun to raise the ramp. A54. Carrying the weight of her body armor, weapon, and other supplies, she fell several feet from the ramp to the ground. A54; A484; A486. Although she was able to continue moving and clear herself of the aircraft, the force of the impact sent a shock throughout her body and along the length of her spine. A54; A484.

Prior to her tour of duty in Iraq, Ms. Sieben was extremely fit with no health issues. A54; A546; A852. After the C-130 incident, however, she began experiencing persistent pain in her back and weakness in her left leg. A51; A54. These symptoms caused significant interference with her ability to complete everyday tasks. For example, she was unable to carry her own bags when leaving Iraq. A153.

Ms. Sieben's symptoms worsened after returning to the United States. A819; A820. She has remained unemployed since her removal from the Air Force in 2006, A66; A135; A303; A413, and is rated 100 percent disabled due to unemployability by the Veterans Administration ("VA").[1] A543-44.

B.    <u>Ms. Sieben suffers from PTSD as a result of her tour of duty in Iraq.</u>

During her tour in Iraq, Ms. Sieben was exposed to an array of traumatic situations that continue to adversely affect her psychological health. A458-62. She was exposed to almost daily episodes of mortar fire, one which knocked her out of bed and another which knocked her off her feet. A152; A225; A436. Mortar fire claimed the lives of friends and coworkers. A152-53. Ms. Sieben was also nearly kidnapped in Baghdad at a time when insurgents were actively seeking to kidnap a Western female service member for propaganda purposes. A154.

In addition to her traumatic experiences, the effect of witnessing the devastation inflicted upon those around her continues to impair Ms. Sieben. She visited countless injured and dying American service members—most the same age as her own children—and Iraqi children maimed by insurgents because their fathers worked for U.S. Forces. A152-53. In another incident, a hysterical Iraqi

---

[1] Both the VA and Air Force apply the Veterans Administration Schedule for Rating Disabilities ("VASRD") when rating disabling injuries. 10 U.S.C. § 1216A(a)(1)(A). The VA rating of 100 percent is based on Ms. Sieben's spinal injury. A543-44.

mother clung inconsolably to Ms. Sieben after her family was kidnapped and forced to rush a military checkpoint, resulting in the deaths of four of her children. A153. These episodes took a lasting psychological toll. A152-53.

While still on active duty in 2005, Ms. Sieben began treatment for anxiety, depression, suicidal ideation, and anger related to post-traumatic stress disorder ("PTSD"). A135; A165-66. Once Ms. Sieben was seen by the VA in September 2006, she was diagnosed with PTSD, anxiety and depression. A164-65; A198-99; A220. The VA rates Ms. Sieben 70 percent disabled for "anxiety disorder with features of post traumatic stress disorder and major depression." A137-39.

C.    Ms. Sieben incurred a traumatic brain injury while on duty in Iraq.

While on duty in Iraq, Ms. Sieben was regularly exposed to intense shock waves from mortar and rocket explosions. A152; A155. On two occasions mortars landed close enough to knock her out of bed or off her feet. A152; A155.

As a result of this exposure, Ms. Sieben's cognitive abilities began to suffer. Her motor skills became impaired, she was unable to concentrate, and was easily confused in situations where she had previously excelled. A153. She had difficulty completing simple tasks, like arranging her transport home from Baghdad. A153.

After returning from Iraq, Ms. Sieben's condition worsened. While still on active duty in April 2006, she reported difficulty concentrating, poor short-term memory, and becoming confused easily. A467. She continues to struggle with

concentration, confusion, and has diminished organizational skills. A313; A344; A347; A467. Her driving skills are impaired because she gets lost easily. A156; A232; A256; A313. Despite her previously demonstrated superior intellectual capabilities, she lost her ability to communicate and write effectively, and is often unable to stay on topic or follow verbal commands. A157; A302-03; A313; A547; A620.

MRI testing supports Ms. Sieben's reported cognitive difficulties. A484. These consequences have been alternately attributed to post-concussive effect, mild traumatic brain injury, cognitive disorder not otherwise specified, and "pain, emotional distress, and fatigue" (hereinafter referred to collectively as "traumatic brain injury"). A174; A216; A219-20; A225; A299; A312; A487.

D.    Because of Ms. Sieben's service-related injuries, she has been unable to follow a substantially gainful occupation.

Prior to her tour of duty in Iraq, Ms. Sieben was serving on active duty at the Pentagon in strategic planning. A213; A313; A852. When not on active duty, she served as a prosecutor for the largest county in Minnesota. A213; A414; A523. Since her discharge in 2006, Ms. Sieben has been unable to work, and her professional licenses have lapsed. A61; A213; A224; A229; A376.

Upon returning from Iraq, Ms. Sieben's care was provided by civilian health care providers. As discussed below, since her removal from the Air Force in 2004 until the Air Force's final determination of her disability rating in 2011, all of Ms.

Sieben's health care providers who gave an opinion on the topic have agreed—Ms. Sieben's service-related injuries have left her unable to engage in a substantially gainful occupation. <u>See</u> A50; A63; A484-85; A487; A495; A524; A801.

II.    <u>After returning from Iraq, Ms. Sieben was placed into the disability evaluation system due to her combat-related injuries.</u>

   A.    <u>The Medical Evaluation Board evaluated Ms. Sieben and entered her into the Air Force's disability system.</u>

After returning from Iraq in 2004, Ms. Sieben's spinal injury did not improve. A819-20. As a result, in October 2005, she was entered into the Air Force's disability evaluation system. A836-37. Based on the results of a physical examination, the Medical Evaluation Board[2] diagnosed Ms. Sieben with spinal conditions and an unspecified neurological condition, which resulted in referral to the Physical Evaluation Board. A831. At this time, Ms. Sieben was being treated for PTSD, but the Medical Evaluation Board did not evaluate these conditions.[3] A831.

---

[2] The disability evaluation process begins when a Medical Evaluation Board documents "the full clinical information of all medical conditions the service member has and state[s] whether each condition is cause for referral into the [disability evaluation system]." Dep't of Defense Instruction 1332.38, Physical Disability Evaluation (Nov. 14, 1996) ("DoDI 1332.38"), *available at* http://www.dtic.mil/whs/directives/corres/pdf/133238.pdf, ¶ E3.P1.2.3, A915 (citing Enclosure 4 which lists conditions that are cause for referral).
[3] The Court of Claims denied Ms. Sieben's motion to supplement the record with records of this treatment. <u>See generally</u> A11.

B. <u>In 2006, the Physical Evaluation Board found Ms. Sieben 100 percent disabled due to her service-related injury and placed her on the temporary disability retired list.</u>

If a veteran is deemed unfit for duty because of one or more disabilities,[4] the

Physical Evaluation Board must rate those disabilities according to the Veterans

Administration Schedule for Rating Disabilities ("VASRD"). 10 U.S.C.

§ 1216A(a)(1)(A). If the service member is rated 30 percent or more disabled, he

or she is medically retired with disability retirement pay, medical care and benefits.

10 U.S.C. § 1201. If the rating is less than 30 percent, the veteran is separated with

severance pay, but no other benefits. 10 U.S.C. § 1203.

In 2006, the Physical Evaluation Board determined that Ms. Sieben was

unfit for continued service and provided a disability rating of 100 percent because

the severity of her condition "render[ed] it impossible to engage [in] a substantially

gainful occupation."[5] A746-47. It further found that her spinal injuries were

---

[4] The Physical Evaluation Board's first duty is to determine whether the service member is fit for duty. DoDI 1332.38, ¶ E3.P1.3.1, A917. A service member is unfit when the evidence establishes that she is unable to reasonably perform the duties of her office, grade or rank. DoDI 1332.38, ¶E3.P3.2.1, A920.

[5] Under the Veterans Administration Schedule for Rating Disabilities, a veteran who is unable to follow a "substantially gainful occupation" due to service connected disabilities "shall" be rated Totally Disabled (100 percent) based on Individual Unemployability. 38 C.F.R. § 4.16(b).

"combat-related." A746-47. The Air Force placed Ms. Sieben on the temporary

disability retired list because her injuries were unstable.[6] A737.

C.  From 2006 until 2009, Ms. Sieben was on the temporary disability retired list where the Air Force maintained a rating of 100% disabled.

After being placed on the temporary disability retired list in 2006, the Air

Force again examined Ms. Sieben in May 2008.[7] A672-75. After this exam, the

Physical Evaluation Board again rated her 100 percent disabled due to

---

[6] If the Physical Evaluation Board finds a service member unfit due to a condition that is unstable, it may place the member on the temporary disability retired list. DoDI 1332.38, ¶ E3.P6.1, A922. A service member can remain in this status no longer than five years; at that time the Air Force must make a final disposition. 10 U.S.C. § 1210(b).

[7] Members on the temporary disability retired list undergo periodic physical examinations to assess the disabling condition and to document new conditions that may entitle the service member to additional disability ratings. 10 U.S.C. § 1210(a); DoDI 1332.38, ¶ E3.P1.2.5.2, A916. These are comprehensive examinations that must meet the minimum criteria of the VA General Medical Exams and Air Force regulations. Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act of 2008, Pub. L. 110-181 (Oct. 14, 2008) ("2008 DoD Policy Memo"), *available at* https://www.hrc.army.mil/site/active/tagd/pda/14_OCT_2008_DTM.pdf, ¶E3.P1.2.6.1.1, A932. The results of the temporary disability retired list physical examination and all prior medical records are sent to a Physical Evaluation Board along with copies of civilian and VA medical records documenting treatment since the last Air Force physical examination. Air Force Instruction No. 36-3212, Physical Evaluation for Retention, Retirement, and Separation (Feb. 2, 2006) (Incorporating Through Change 2, Nov. 27, 2009) ("AFI 36-3212"), *available at* http://static.e-publishing.af.mil/production/1/af_a1/publication/afi36-3212/afi36-3212.pdf, ¶¶ 7.4.1, 7.4.4, A899 & 7.10.2, A902. The Physical Evaluation Board determines fitness for duty, disability rating for each condition that makes the service member unfit, and if the condition is stable and permanent, recommends separation from service or disability retirement. DoDI 1332.28, ¶E3.P1.3.1, A917.

unemployability and kept her on the temporary disability retired list. A667-68. Although Ms. Sieben informed the Air Force that she was being treated for PTSD and traumatic brain injury, the Air Force did not evaluate these conditions. A710.

III.   In 2009, Ms. Sieben underwent two Air Force directed medical evaluations.

Ms. Sieben underwent another periodic physical exam for her spine in September 2009. Like she had in 2008, Ms. Sieben informed the Air Force she was being treated for PTSD and traumatic brain injury, but the Air Force again did not evaluate these conditions. A599. The exam in September 2009 differed from prior exams, however, in that it consisted of two separate evaluations. A611-13; A619-21.

   A.   Dr. Barr agreed with all previous tests and exams in finding that Ms. Sieben suffers from serious service-related spinal injuries.

One of these evaluations was performed by Air Force Dr. Barr.[8] A611-13. Dr. Barr's findings were consistent with Ms. Sieben's civilian providers and prior military examinations—he found that Ms. Sieben suffered from a severe degree of disability due to her spinal injuries. Specifically, Dr. Barr found that Ms. Sieben

---

[8] The Air Force removed Dr. Barr's original report and replaced it with the illegible copy at A611-13. A more readable version is provided at A894-95. The original—and most readable—version of this report is not in the record, but is reproduced below.

suffered from debilitating low back pain, antalgic[9] gait, left leg weakness and unsteady, weaker reflexes in the entire left lower leg, decreased spinal range of motion, and tenderness on her spinous processes. A895. Dr. Barr concluded, "It is my opinion based on the evidence that the back pain will continue and will be activity related. Activities requiring prolonged sitting or standing will markedly worsen the symptoms. Her [primary] job duties involved prolonged sitting." A895.

B. <u>Capt. Garza downplayed Ms. Sieben's service-related injuries, but did not opine that she would be able to engage in a substantially gainful occupation.</u>

The second evaluation was conducted by Capt. Garza, a physician's assistant. A619-21. Capt. Garza's report significantly downplayed the extent of Ms. Sieben's injuries. He opined she had "pain out of proportion upon palpation of the spinous processes," and attributed left foot spasticity to "questionable poor effort vs. lack of cooperation." A620. He concluded there was "a <u>possibility</u> that she would be able to perform <u>predominantly administrative duties</u>." A620 (emphasis added). Capt. Garza did not opine on Ms. Sieben's PTSD or traumatic brain injury, or on whether Ms. Sieben could engage in a substantially gainful occupation.

---

[9] "Antalgic" means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 97 (32nd ed. 2012).

IV.    Based only on Capt. Garza's report—which did not address whether Ms. Sieben could engage in a substantially gainful occupation—the Air Force decreased Ms. Sieben's disability rating to 20 percent and did not rate her PTSD or traumatic brain injury.

      A.    Based only on Capt. Garza's report only, the Informal Physical Evaluation Board rated Ms. Sieben 10 percent disabled.

In January 2010, Ms. Sieben's medical records were forwarded to an Informal Physical Evaluation Board for its determinations of fitness for duty and disability rating.[10] Unbeknownst to Ms. Sieben, Dr. Barr's original report was removed and replaced with a copy that was reduced in size and illegible. A612-13. Provided below is a replication of the original report prepared by Dr. Barr (not in the record), followed by a replication, to size, of the version that the Air Force substituted in the original's place and provided to the Physical Evaluation Boards. A612-13.

---

[10] The Informal Physical Evaluation Board reviews medical, personnel and related documentation to determine fitness for duty. The service member is not present. DoDI 1332.38, ¶E3.P1.3.2, A917.

Figure 1:



**ANESTHESIA PAIN MEDICINE CLINIC**
Wilford Hall Medical Center 210-292-7160

| DATE 9-4-09 | | STAFF Barr |
|---|---|---|

不疼

| | | PAIN SCORES |
|---|---|---|
| BP 139/91 | **INITIAL VISIT:** Referred by TDRL → pt does to meet 2 body armor 60? | |
| HR 76 | **Pain CC:** **Low Back** Onset: Sudden/Gradual | Now 4 /10 |
| RR 16 | Frequency: Constant/Y/N Duration: 5 mos/yrs | Best 0 /10 |
| SaO₂ | Character: Ache/Throb/Stab/Burn/Shoot | Worst 8 /10 |
| Temp. | Radiation: heaviness to ⃝ leg/⃝ legs, radiation to both | **Symptoms:** + - |
| Ht. 5'5" | ↑: Standing, sitting for long periods of time. | Numbness oↄↄleg |
| Wt. 125/162 | ↓: facet injections, laying down | Paresthesia |
| BDI= 8/63(#9=∅) | 54 y/o w/ chronic LBP. while deployed in Iraq | Dysesthesia |
| ODI= 33/60 | assigned to unit in army, carry heavy body armour and fall off | Weakness od leg |
| ALL: AutoCite Reviewed | ramp from back of aircraft. Her military duties prior to her injury | |
| MEDS: Done | included work @ Pentagon involved in strategic planning that required | **ROS:** + - |
| Gabapentin Baug TID | prolonged sitting. She doesn't think that she will be able to | Fever |
| | return to her previous duties based on her condition. She is | Wt. Loss |
| | able to climb stair, shop (with assistance of walker). Earlier this | Fatigue |
| | year, she underwent BKA of left, then right lower back | Insomnia |
| Effexor | ē much improvement of her pain and increase in functional status | Rash |
| Ritalin | to where she could stand up right @ end of day. Her pain | Diaphoresis |
| | is completely relieved by laying down. She has been receiving | Eye Prob. |
| | spinal rehab @ a PT center that has helped ē | ENT Prob. |
| | pelvic alignment, spine alignment and core strengthening | Chest Pain |
| PMH: AutoCite Reviewed | exercises. | Edema |
| PTSD | | SOB |
| TBI | | |
| | | Nausea |
| | | Emesis |
| | **Therapies Tried for CC:** Pain ↓: | Hematemes. |
| PSH: | PT/- Heat -- Cold -- Massage Y/N - Y/N -- Y/N -- Y/N | Constipation |
| hysterectomy '09 | TENS -- Acupunct. -- Chiropract. Y/N -- Y/N -- Y/N | Hematochz. |
| varicose vein stripping 92, 85, 90 | **Meds Tried for CC (Improved: ++, +, ±, - /Side Effects: list):** | Melena |
| | Opioids Ultram ( ± / ∅ ) ( / ) | Incontinence |
| | | Bowel |
| SH: S-M/D-W 2 kids | NSAIDs Ibuprofen (+↓ stomach problems) Naprosyn (± / ∅) | Bladder |
| Abuse Hx Y /N | Tramadol inj x1 (+ / caution in ED) | Dizziness |
| Fam. Ab. Hx Y /N | Relaxants ( / ) ( / ) | Syncope |
| Tob Y / N | AEDs Neurontin (+/ ∅ ) ( / ) | Memory ↓ppt |
| EtOH Y/N Occ, Sxm | Antidepress. Effexor ( / ) ( / ) | Mood △ |
| **NAME** Sielsen Mary | Other | A=Acute (< 3 mo.) |
| **ID#** 20084-80-7826 | | C=Chronic (≥ 3 mo.) |
| | | NEXT PAGE |

MRL Done = Medication Reconciliation List reviewed with patient, updated with any changes, and given to patient.

ANESTHESIA PAIN MEDICINE CLINIC: INITIAL VISIT Page 2    不疼

**Studies:** MRI L-spine ( / / ):
Per npart: L3 - S, spondylolisthesis , L4-5 annular tear, ④ L5 pars defect③

X-rays L-spine ( / / ):

**PE:** GEN: VS noted; NAD; WDWN  M /Ⓕ    PSYCH: A & O x 4 ; articulate; well-groomed
HEENT: WNL, + / Ⓘcterus   NECK: Supple; + /ⓉM   HEART: ⊕⊕⊕ + /Ⓜm/r/g   LUNGS:Ⓒ - CTA Ⓑ
SKIN: + /Ⓡash                                        GAIT: nl / R L Ⓐ∂talgic
NEURO: DTR: pat R/L 2 +/ 2 +, Ach R/L 1 +/ 1 +; MS: 5 /5 Ⓑ LEs, except 4/5 for entire UE (hip flex ext, knee flex ext, ankle flex ext)
Sensory: Intact to LT & PP
MSk: Low Back; Sym: _____ ; AROM: flex hand flexn ext ↑↓, lat flex R/L ↓ / ↓ ; rot R/L ↓↓ / ↓↓ ;
Facet load R/L nl / nl ; FAbER R/L nl / nl ; SIJ mobility R/L nl / nl ; PSIS tender R/L ⊖/ ⊖ ;
Hip pain int/ext rot R/L nl / nl ; SLR R/L nl @ ?40° / nl @ ?40° ;
+ TTP @ spinous process ~ L3-L5

**A/P:** ( 1 ) Chronic Pain (338.2)
( 2 ) Chronic Low Back Pain
3. lumbar spondylolisthesis
4. lumbar DDD
- Patient to continue c civilian pain physician for treatment

TDRL Narrative
Col Sieben continues to suffer debilitating low back
pain that prevents her return to Active Duty. It
is my opinion based upon the evidence, that the back
pain will continue and will be activity related. Activities
that require prolonged sitting or standing markedly worsen
the symptoms. Her 1° job duties involved prolonged sitting.

Line of Duty: Yes
Deployable: No.
Retainable: No

_____
Jeffrey Barr, Major, USAF, MC
Director, Pain Medicine Clinic
[illegible] Medical Wing/[illegible]

**Staff:** Patient seen and evaluated; agree with above.
15 minutes spent in counseling and/or patient education.

The collection of information is governed by the authority, Purpose and Routine Uses identified in DD Form 2005. Privacy Act Statement – Health Care Records.

Figure 2:

CHRONOLOGICAL RECORD OF MEDICAL CARE
THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT OF 1974 (PL-93-579). UNAUTHORIZED ACCESS
TO THIS INFORMATION IS A VIOLATION OF FEDERAL LAW. VIOLATORS WILL BE PROSECUTED.

STANDARD FORM 600 (REV. 5)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505
Page 2 of 4

Name: SIEBEN, MARY VIRGINIA

| | |
|---|---|
| Sex: | F |
| Tel H: | 651-437-7388 |
| Tel W: | 651-470-1075 |
| CS: | |
| SWS: | |

FMP/SSN: 20/    7826
DOB:     USA
PCat: F12.A USAF AD RES
MC Status:
Insurance: No

Sponsor/SSN: SIEBEN, MARY VIRGINIA/084807826
Rank: COLONEL
Unit: LA0JFCQX (0059 MEDICAL WG)
Outpt Res. Rm: OUTPATIENT RECORDS
PCM:
Tel. PCM:

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE | | |
|---|---|---|---|
| 04 Sep 2009 1252 | Facility: 59th Medical Wing Lackland AFB, TX 78236 BARR, JEFFREY W | Clinic: Pain Mngt Clinic, WHMC | Provider: |

**ANESTHESIA PAIN MEDICINE CLINIC: INITIAL VISIT Page 2**

Studies: MRI L-spine ( / / ):
Per report L-s. S, spondylolisthesis, L4-5 annular tear, (B) L5 pars defects

X-rays L-spine ( / / ):

PE: GEN: VS noted; NAD; WDWN W/ H/(F) PSYCH: A & O x 4; articulate; well-groomed
HEENT: WNL, + / (-) icterus NECK: Supple; + / (-) JVD HEART: + / (-) m/r/g LUNGS: (+) / - CTA (B)
SKIN: + / (-) rash GAIT: nl / R L antalgic
NEURO: DTR: pat R/L 2+/2+, Ach R/L 1+/1+; MS: 5/5 (B) LEs except 4/5 ...
Sensory: Intact to LT & PP
MSK: Low Back: Sym: ___; AROM: flex ..., ext ..., lat flex R/L ↓ / ↓; rot R/L ... / ...;
Facet load R/L nl / nl; FADER R/L nl / nl; SI/ mobility R/L nl / nl; PSIS tender R/L (-) / (-);
Hip pain int/ext rot R/L nl / nl; SLR R/L nl @ ... / nl @ ...;
+ TTP @ ... ~ L5-L5

A/P: (1) Chronic Pain (338.2)
(2) Chronic Low Back Pain
3. lumbar spondylolisthesis
4. lumbar DDD
- Patient to continue ... civilian pain physician for treatment

TDRL Discussion
Col Sieben continues to suffer debilitating low back pain that prevents her return to Active Duty. It is my opinion based upon the evidence, that the back pain will continue and will be activity related. Activities that require prolonged sitting or standing markedly worsen the symptoms. Her ... job duties involved prolonged sitting.

Line of Duty: Yes
Deployable: No
Retainable: No

Staff: Patient seen and evaluated; agree with above.
15 minutes spent in counseling and/or patient education.

Note Written by CROUCH, JAN L @ 04 Sep 2009 1252 CDT
**Consult Order**
**Referring Provider:** LIGHTNER, CYNTHIA R
**Date of Request:** 19 Jun 2009
**Priority:** Routine

**Provisional Diagnosis:**

LBP

**Reason for Request:**

TDRL PATIENT..R/S APPT PER TDRL COORDINATOR..JMS/CAMOMEB OFFICE REF. TDRL EVAL. PAIN. DO NOT REFUSE.

**Name: SIEBEN, MARY VIRGINIA**

| | | | | | |
|---|---|---|---|---|---|
| | | Sex: | F | Sponsor/SSN: | SIEBEN, MARY VIRGINIA/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 |
| FMP/SSN: | 20[redacted]826 | Tel H: | 651-437-7388 | Rank: | COLONEL |
| DOB: | [redacted]1954 | Tel W: | 651-470-1075 | Unit: | LA0JFCGX (0059 MEDICAL WG) |
| PCat: | F12.A USAF AD RES | CS: | | Outpt Rec. Rm: | OUTPATIENT RECORDS |
| MC Status: | | SWS: | | PCM: | |
| Insurance: | No | | | Tel. PCM: | |

CHRONOLOGICAL RECORD OF MEDICAL CARE
THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT OF 1974 (PL-93-579). UNAUTHORIZED ACCESS TO THIS INFORMATION IS A VIOLATION OF FEDERAL LAW. VIOLATORS WILL BE PROSECUTED.

STANDARD FORM 600 (REV. 5)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

Page 3 of 4

A613

In addition, the Informal Physical Evaluation Board mistakenly attributed Capt. Garza's report to his supervisor, Dr. Jenne. A598. It is not disputed that Dr. Jenne did not examine Ms. Sieben.[11] Under these conditions, the informal board found Ms. Sieben unfit for duty and assigned a disability rating of 10 percent to her spinal condition. A598. It did not rate Ms. Sieben's PTSD or traumatic brain injury.

> B. **Capt. Garza's report was the only medical evidence the Formal Physical Evaluation Board relied on to rate Ms. Sieben 10 percent disabled without considering her PTSD or traumatic brain injury.**

Ms. Sieben appealed to the Formal Physical Evaluation Board,[12] requesting a disability rating of 100 percent under the VASRD, 38 C.F.R. § 4.16(b), which provides that persons unable to engage in a "substantially gainful occupation . . . shall be rated totally disabled." 38 C.F.R. § 4.16(b); A480. At the May 2010 hearing, Ms. Sieben provided current testing results and opinions from her doctors,

---

[11] Computerized time stamps show Dr. Jenne reviewed Garza's report two weeks later, but only for one minute. A619. Ms. Sieben wrote to Dr. Jenne to object to Capt. Garza's report, but he never responded. A455.

[12] If the service member does not agree with the results of the Informal Physical Evaluation Board, he or she may appeal to the Formal Physical Evaluation Board, which provides a non-adversarial full hearing in which the service member appears in person. 10 U.S.C. § 1214; DoDI 1332.38, ¶ E3.P1.3.3, A917.

all stating she was incapable of following a substantially gainful occupation.[13] For
ease of reference, the evidence from both the military reviews and from Ms.
Sieben's private doctors that was provided and available to the Formal Physical
Evaluation Board is shown in the table below:

| Table 1 | | |
|---|---|---|
| Authority | Substantially Gainful Employment? | Comments |
| Gen. Schuessler (2006) Commander | No | Incapable of "meaningful work. . . much less mak[ing] a living." A821. |
| Gen. Heggemeier (2006) Chief of Staff | No | "I cannot imagine a civilian occupation that would accommodate her need to work limited hours (2 hours/day)." A819. |
| John Hovde, MA PT (2006) Functional Capacity Testing Specialist | No | "2-hour shifts . . . being allowed to stay up to 3 hours on days when she is tolerating the activity better. To work longer . . . [she] would have to . . . recline for significant periods of time, such as 30-120 minutes." A801. |
| Dr. Haber (2007) AF-Directed Work Testing Specialist | No | "I can think of no programs . . . that would restore her capacity to engage in the world of work." A63. |
| Dr. Karayusuf (2008) Social Security Examiner | Did not specifically address | "Not able to consistently understand, retain and follow instructions. Emotionally very labile. . . not be able to consistently interact with fellow workers, supervisors and the public." A157. |

---

[13] These included March 2010 results from a physical capabilities evaluation,
A492-500, and work rehabilitation testing, A514-26, indicating unemployability
since 2006 and 2007, respectively. As well, she provided current opinions from
three of her doctors, all of whom similarly concluded that Ms. Sieben is not
employable. A50; A484; A486.

| | | |
|---|---|---|
| Dr. Lutz (2009) AF-Directed Pain Specialist | No | "She is not a candidate for competitive employment." A50. |
| Dr. Barr (2009) AF Doctor, Performed TDRL Exam | Did not specifically address | "Activities that require prolonged sitting or standing markedly worsen the symptoms. Her [primary] job duties involved prolonged sitting." A895. |
| Capt. Garza (2009) AF Physician's Assistant, Performed TDRL Exam | Did not specifically address | "[P]ossibility that she would be able to perform predominantly administrative duties." A620 |
| Dr. Haber (2010) AF-Directed Work Rehab Testing Specialist | No | "I can think of no programs of vocational rehabilitation that would help restore Ms. Sieben to . . . work on even a half-time basis." A524. |
| John Hovde, MA PT (2010) AF-Directed Functional Capacity Testing Specialist | No | "2-hour shifts and some days . . . up to 3 hours. To work longer, it would have to be in an environment in which she was able to recline for a significant period of the day." A495. |
| Dr. Noran (2010) Neurology Consult | No | "This low back condition that she has and has persisted for this long . . . would be enough in itself to prevent her from being gainfully employed at this time." A487. |
| Dr. Champagne (2010) Director, VA Polytrauma Rehab Center | No | "She is not able to engage in gainful employment at this time or in the future." A485. |

Notwithstanding the wealth of evidence showing Ms. Sieben to be unable to engage in substantially gainful occupation, and the absence of evidence to the

contrary, the formal Physical Evaluation Board rated Ms. Sieben's spine 10 percent

disabled. A434. It did not consider any evidence Ms. Sieben provided, nor did it

apply the mandatory rating criteria at 38 C.F.R. § 4.16(b). A438. In making its

determination, the <u>only</u> medical evidence of Ms. Sieben's current condition relied

on by the Formal Physical Evaluation Board was Capt. Garza's report. A438.

Additionally, the Formal Physical Evaluation Board declined to rate Ms. Sieben's

PTSD and traumatic brain injury because these were not "caused by her back

condition . . . nor are directly related to its treatment." A437.

C. <u>The Secretary of Air Force Personnel Council increased Ms. Sieben's disability rating to 20 percent but ignored her request to be rated under Section 4.16(b) and did not rate PTSD or traumatic brain injury.</u>

Ms. Sieben appealed the 2010 Formal Physical Evaluation Board decision to

the Secretary of Air Force Personnel Council ("Secretary"). A52-74. Regarding her

spinal injury, the Secretary ignored Ms. Sieben's request to be rated under 38

C.F.R. § 4.16(b) due to her inability to follow a "substantially gainful occupation."

A34-35. The Secretary also did not rate Ms. Sieben for PTSD or traumatic brain

injury, citing a "lack of documentation," and "no evidence of functional cognitive

deficits." A34-35. It concluded that "[PTSD and traumatic brain injury] have been

evaluated, as is required. Neither PTSD nor [traumatic brain injury] will be

considered unfitting conditions at the time of placement on the [temporary

disability retired list], and no rating [shall be] assigned." A35. Although the

22

Secretary increased her disability rating due to antalgic gait, it was only increased

to 20 percent. A35. A rating of 30 percent is required for a veteran to be medically

retired with disability retirement pay, medical care and benefits. 10 U.S.C. § 1201.

In lieu of separation, Ms. Sieben was transferred to the inactive status list[14] to await

her reserve retirement benefits at age 60. A30.

V.      The Court of Federal Claims appeared to agree that Ms. Sieben's disability
        rating was improper, but deferred to the Air Force's decision.

        On December 14, 2011, Ms. Sieben appealed the Secretary's decision to the

Court of Federal Claims. Regarding her claim to be rated 100% disabled under 38

C.F.R. § 4.16(b), the Court did not apply the mandatory "substantially gainful

occupation" test. Instead, the Court concluded that while it "may have weighed the

evidence differently," the record contained "sufficient information . . . to support

the determination that she is not totally disabled." A15 (emphasis added). With

regard to PTSD and traumatic brain injury, the court held that Ms. Sieben "failed

to present sufficient evidence to show that these conditions were unfitting at the

time she was placed on the TDRL." A11. The court did not consider that the Air

Force is required as a matter of law and regulation to provide this evidence in order

---

[14] A member of the reserve component with over 20 years of service who is rated less than 30 percent disabled is entitled to be placed on the inactive status list, which results in separation without pay or medical care until age 60 when previously accrued reserve retirement begins.10 U.S.C. § 1209. Ms. Sieben was eligible for the inactive status list even without being injured in Iraq by simply retiring voluntarily.

to properly assign disability ratings. 10 U.S.C. § 1216A(b); DoDI 1332.38, ¶¶ E3.P1.2.5, A916 & E3.P6.2.2, A922; AFI 36-3212, ¶¶ 7.12, A902 & 7.16, A904.

## SUMMARY OF THE ARGUMENT

When combat-related injuries render a service member incapable of holding a "substantially gainful occupation," she is entitled to disability benefits as a matter of law. 10 U.S.C. § 1216A(a)(1)(A); 38 C.F.R. § 4.16(b). The Air Force and Court of Claims ignored this mandate and instead required Ms. Sieben to show "total disability" in order for it to find her "unemployable." A438. As a result, the Air Force denied Ms. Sieben her rightful disability benefits by requiring her to meet a more stringent test than is provided by law and regulation. 10 U.S.C. § 1216A(a)(1)(A); 38 C.F.R. § 4.16(b).

The Air Force violated Ms. Sieben's right to due process when it denied her a disability retirement based on incomplete and altered evidence. Cushman v. Shinseki, 576 F.3d 1290, 1299 (Fed. Cir. 2009). The Air Force was required to conduct comprehensive medical examinations that documented all of her medical conditions including her spinal injury, PTSD, and traumatic brain injury. 10 U.S.C. § 1216A(b); DoDI 1332.38, ¶¶ E3.P1.2.3, E3.P1.2.5, A915-16; AFI 36-3212, ¶¶ 7.9-7.9.4, A900-01. Because it failed to provide this evidence, Ms. Sieben's disability rating failed to account for all of her medical conditions and resulted in denial of a disability retirement. Furthermore, the Air Force altered a material

medical record by removing a favorable Air Force doctor's exam narrative from

Ms. Sieben's records and replacing it with an illegible copy. The Air Force

violated Ms. Sieben's right to due process by providing incomplete and altered

evidence for determination of her disability rating.

## ARGUMENT

I.   <u>Standard of Review</u>

Generally, this Court reviews statutory and constitutional issues <u>de novo</u>.

<u>SKF USA, Inc. v. U.S. Customs & Border Prot.</u>, 556 F.3d 1337, 1349 (Fed. Cir.

2009) (citing <u>U.S. Shoe Corp. v. United States</u>, 296 F.3d 1378, 1381 (Fed. Cir.

2002)). Furthermore, this Court reviews "legal determinations of the United States

Court of Federal Claims, such as a judgment on the administrative record, <u>de

novo</u>." <u>Roth v. United States</u>, 378 F.3d 1371, 1381 (Fed. Cir. 2004); <u>see also</u>

<u>Chambers v. United States</u>, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing <u>McHenry

v. United States</u>, 367 F.3d 1370, 1377 (Fed. Cir. 2004)). Where, as here,

"procedural violations are alleged, the test or standards against which this court

measures the military's conduct are inherent: they are the applicable statutes and

regulations." <u>Adkins v. United States</u>, 68 F.3d 1317, 1323 (Fed. Cir. 1995) (citing

<u>Murphy v. United States</u>, 993 F.2d 871, 873 (Fed. Cir. 1993)). "In such instances,

this Court . . . determines whether the procedures were followed by applying the

facts to the statutory or regulatory standard." <u>Id.</u> (internal quotations omitted). In

cases "where the material facts are not in dispute and the adoption of a particular legal standard would dictate the outcome of a veteran's claim, we treat the application of law to undisputed fact as a question of law." Comer v. Peake, 552 F.3d 1362, 1366 (Fed. Cir. 2009) (citations omitted).

II.    The Air Force Erred as a matter of law when it failed to apply the correct legal standard to determine Ms. Sieben's disability rating.

      A.    The plain language of 10 U.S.C. § 1216A requires the Air Force to apply a "substantially gainful occupation" standard when rating Ms. Sieben's disabilities.

The Air Force must follow applicable law and regulation when making disability rating determinations. Murphy, 993 F.2d at 873 ("[T]he military . . . [is] bound to follow its own procedural regulations."). Section 1216A requires the Air Force to use the schedule for rating disabilities used by the Department of Veterans Affairs. The law states:

> In making a determination of disability of a member of the armed forces . . . the Secretary concerned . . . shall . . . utilize the schedule for rating disabilities in use by the Department of Veterans Affairs, including any . . . interpretation of the schedule by the United States Court of Appeals for Veterans Claims . . . [and] may not deviate from the schedule or any such interpretation of the schedule.

10 U.S.C. § 1216A(a)(1)(A-B).[15] See also McHenry, 367 F.3d at 1378 (holding

that 10 U.S.C. § 1201 requires disability ratings to be based on the VASRD).

The Department of Veterans Affairs uses the VASRD to make disability

rating determinations. 38 C.F.R. §§ 4.1-4.150. The VASRD provides mandatory

standards to be implemented by the Air Force in its disability rating decisions. One

provision of the VASRD, found at 38 CFR § 4.16(b), provides that "[A]ll veterans

who are unable to secure and follow a substantially gainful occupation by reason of

service-connected disabilities shall be rated totally disabled." 38 C.F.R. § 4.16(b)

(emphasis added). The statutory directive is clear that a veteran must be rated

totally disabled when she is unable to engage in a substantially gainful occupation

because of service-connected disabilities.

The Court of Appeals for Veterans Claims provides the appropriate

interpretations of the "substantially gainful occupation" standard. 10 U.S.C.

_____

[15] Congress passed the National Defense Authorization Act of 2008, enacting
significant pro-veteran changes to the disability evaluation system, including how
injuries are rated. As explained by Representative McHugh, the legislation was
meant to "end the frustration that exists between the Department of Defense and
veterans retirement and disabilities systems," and by Representative Skelton, "it
will bring significant new oversight to the Department of Defense in areas where
oversight is sorely needed." 153 CONG. REC. 15347 (2007) (statement of Rep.
McHugh) (referring to H.R. 1585, an earlier version of NDAA 2008); see generally
NDAA, § 1, 122 Stat. at 3 ("The Joint Explanatory Statement submitted by the
Committee of Conference for the conference report to accompany H.R. 1585 of the
110th Congress (Report 110-447) shall be deemed to be part of the legislative
history of this Act as it would have had with respect to the implementation of H.R.
1585, if such bill had been enacted.").

§ 1216A(a)(1)(A-B). That Court has explained that a person is unable to follow a substantially gainful occupation when they are unable to engage in employment which is "ordinarily followed by the non-disabled to earn their livelihood with earnings common to the particular occupation in [the community]." <u>Beaty v. Brown</u>, 6 Vet App. 532, 538 (1994) (citations omitted). It follows that "[m]arginal employment is not considered substantially gainful employment." <u>Id.</u> at 537. For example, "[t]he ability to work only a few hours a day or only sporadically is not the ability to engage in substantially gainful employment." <u>Moore v. Derwinski</u>, 1 Vet. App. 356, 359 (Vet. App. 1991).

  B. <u>The Air Force erred as a matter of law by requiring "total disability" and "unemployability" instead of an inability to follow a "substantially gainful occupation."</u>

  Ms. Sieben is not required to prove she is totally disabled or completely unemployable, but <u>only</u> that she cannot engage in a substantially gainful occupation. <u>Roberson v. Principi</u>, 251 F.3d 1378, 1385 (Fed. Cir. 2001) ("Roberson asserts that the plain language of the regulation does not require the veteran to show 100 percent unemployability in order to prove that he cannot 'follow substantially gainful occupation.' We agree."). In making this determination, the Air Force "may not reject [her] claim without producing evidence, as distinguished from mere conjecture, that [Ms. Sieben] can perform work that would produce a sufficient income to be other than marginal." <u>Beaty</u>, 6

Vet. App. at 537; <u>Cathell v. Brown</u>, 8 Vet. App. 539, 544 (1996) ("When the [military] makes a determination that the [veteran] is not unemployable under 38 C.F.R. § 4.16(c), it must state on the record the [veteran] was able to secure or follow a substantially gainful occupation.") (quoting <u>Gleicher v. Derwinski</u>, 2 Vet. App. 26, 28) (Vet. App. 1991) (internal quotations omitted). Furthermore, this Court has iterated that "[t]here is no authority for reducing [disability] percentages beyond those found in the [VASRD] schedule itself." <u>McHenry</u>, 367 F.3d at 1379 (quoting <u>Wolf v. United States</u>, 168 Ct. Cl. 24, 32 (1964)) (internal alterations omitted).

The Air Force did not properly consider the "substantially gainful occupation" standard when it determined Ms. Sieben's disability rating. Instead, it required Ms. Sieben to prove her spinal injury merits a "total disability rating" in order to prove she is "unemployable."[16] A438. Like the Air Force, the Court of Claims also did not analyze the substantially gainful occupation standard, focusing instead on total disability. <u>See</u> A15 (finding "sufficient information . . . to support the determination that she is not <u>totally disabled</u>") (emphasis added). By requiring total disability and unemployability, the Air Force and Court of Claims unfairly

_____

[16] "The FPEB concludes the objective evidence of the record, her current TDRL examination, the documented ability to perform activities of daily living/instrumental activities of daily living, low impact exercise, and engage in recreational pursuits do not substantiate a <u>total disability</u> rating and a finding that Colonel Sieben is <u>unemployable</u>." A438 (emphasis added).

imposed upon Ms. Sieben a stricter standard than the "substantially gainful occupation" standard required by law and regulation. Because a total disability rating is the mandatory <u>result</u> of being unable to follow a substantially gainful occupation—not a <u>prerequisite</u>—this constitutes legal error.

      C.    <u>Applying the proper legal standard, the evidence exclusively establishes that Ms. Sieben is unable to engage in a substantially gainful occupation.</u>

As listed in the table above (<u>see supra</u> "Table 1"), the evidence showing Ms. Sieben's inability to engage in a substantially gainful occupation comes from myriad sources, both Air Force and private: Ms. Sieben's Air Force Commander (A761), her Chief of Staff (A819), her medical doctor pain specialist (A50), the Director of the VA Polytrauma Rehab Center (A485), Ms. Sieben's consulting civilian neurologist (A487), work rehabilitation testing (A524), and functional capacity evaluations (A495; A801). Furthermore, Air Force Doctor Barr, who examined her during her 2009 temporary disability retired list examination, stated that prolonged sitting or standing would markedly worsen Ms. Sieben's symptoms, (A895), and Dr. Karayusuf, a Social Security Administration examiner, stated that Ms. Sieben was "not able to consistently understand, retain and follow instructions . . . [and would] not be able to consistently interact with fellow workers, supervisors and the public," because of her injuries. A157. All of this evidence is consistent with the VA's determination that Ms. Sieben is entitled to a rating of

100 percent disabled. A543-44. There is <u>no</u> evidence refuting the conclusion that Ms. Sieben is unable to follow a substantially gainful occupation.

>    D.    <u>Capt. Garza's report does not alter the conclusion that Ms. Sieben is unable to engage in a substantially gainful occupation.</u>

Captain Garza's report does not alter the fact that applying the proper legal standard results in the inescapable conclusion that Ms. Sieben is unable to engage in a substantially gainful occupation. First, nothing in Capt. Garza's report suggests that Ms. Sieben can follow a substantially gainful occupation. At most, it suggests a "possibility" that she could perform "predominantly administrative duties." A620.

Second, under the VASRD the Air Force was required to rely on Dr. Barr's report rather than Capt. Garza's. <u>See</u> 38 C.F.R. § 4.7 (requiring the Air Force to base disability ratings upon the higher of two evaluations, so long as that evaluation's findings more closely address the relevant criteria); 38 C.F.R. § 4.3 (requiring reasonable doubt that arises regarding the degree of disability to be resolved in favor of the claimant). Dr. Barr's report more closely addressed the relevant criteria because he described Ms. Sieben's limitations in the workplace. A895 (concluding that "activities that require prolonged sitting or standing markedly worsen her symptoms," and "[h]er [primary] job duties involved prolonged sitting"). Capt. Garza's report, on the other hand, did not provide any medical conclusions that would allow the Air Force to make a reasonable

determination of Ms. Sieben's disability rating under the relevant criteria. A612 (stating only that there is a "possibility that she would be able to perform predominately administrative duties") (emphasis added). And even if Capt. Garza's report was on point, the Air Force should have based its rating on the higher of the two evaluations.

Third, Air Force regulations make it clear that disability evaluations are to be conducted by an actual physician. See DoDI 1332.38, ¶E3.P1.2.6, A916 ("Physician's Guide") (emphasis added); AFI 36-3212, ¶2.2.1, A897 ("The attending physician . . . will conduct the exam.") (emphasis added); ¶6.8.2.3.5, A898 & ¶7.9.4, A901 (providing instructions that are directed to "[t]he examining physician") (emphasis added); ¶7.4.4, A899 (listing information that the "member shall provide to the examining physician") (emphasis added); ¶7.9.1, A900 (providing that the exam report must "includ[e] anything the examining physician discovers or observes as to what the member is actually able to do or not do") (emphasis added). Capt. Garza is a physician's assistant, and therefore should not have conducted Ms. Sieben's disability evaluation in the first place. This error was compounded when the Informal Physical Evaluation Board mistakenly attributed Capt. Garza's report to his supervisor, Dr. Jenne. A598. Dr. Barr, on the other hand, is a qualified physician.

Despite the fact that it was clearly required to do so, the Air Force did not consider Dr. Barr's report. Dr. Barr's report was removed from the record and replaced with an illegible version. See supra Figures 1-2 and discussion below. The failure to consider Dr. Barr's report is further evidenced by the fact that the Air Force failed to make any mention of his findings when it determined Ms. Sieben's disability rating. Instead, the Air Force relied entirely on Capt. Garza's report for medical evidence:

> The Sep 2009 TDRL evaluation indicates . . . [p]**ain out of proportion upon palpation of spinous process**. . . . Strength testing revealed [normal] strength in all nerve roots. Strength testing of the left lower extremity [was normal] . . . **questionable poor effort versus lack of cooperation** on exam due to spasticity of motion upon strength testing. . . . **possibility she would be able to perform predominately administrative duties** in the military.

A438 (formal PEB) (emphasis added). The Court of Claims also considered only Capt. Garza's report for medical evidence. A15 (concluding there was "substantial evidence to support the Air Force's conclusions" that Ms. Sieben was not entitled to be rated under 38 C.F.R. § 4.16(b)).

This constitutes legal error. Dr. Barr's report was more favorable to Ms. Sieben than Capt. Garza's, and it more closely addressed the "substantially gainful occupation" standard. Furthermore, Capt. Garza did not meet the qualifications necessary to conduct Ms. Sieben's disability evaluation in the first place. Applying

the proper legal standard, the evidence unquestionably demonstrates that Ms.

Sieben cannot follow a substantially gainful occupation.

> E.     <u>Ms. Sieben requests that this Court reverse the Air Force's rejection of her claim for disability, or alternatively, remand for a correct determination of her disability rating under the correct legal standard.</u>

Where, as here, the Court of Federal Claims erred as a matter of law,

reversal is appropriate. <u>Brickwood Contrs., Inc. v. United States</u>, 288 F.3d 1371,

1381 (2002) (reversing the Court of Federal Claims because it applied the wrong

legal standard); <u>see also</u> <u>Moore</u>, 1 Vet. App. at 359 (reversing the VA's

determination that veteran was able to follow "substantially gainful occupation"

because it was based upon an erroneous view of the law and because there existed

no plausible basis for such a finding). In the alternative, the Court should remand

Ms. Sieben's case for a determination of her eligibility for a rating of total

disability based upon individual unemployability. <u>Roberson</u>, 251 F.3d at 1385

(concluding that because the VA applied an incorrect standard for total disability

due to individual unemployability, a remand is appropriate so that the correct

standard may be applied); <u>see also</u> <u>Peterson v. Shinseki</u>, 2012 U.S. App. Vet.

Claims LEXIS 747 (April 18, 2012) ("Remand is appropriate where the [military]

has incorrectly applied the law.").

III.   The Air Force violated Ms. Sieben's right to due process under the Fifth
       Amendment and 10 U.S.C. § 1214 when it relied on incomplete and altered
       evidence in determining her disability rating.

The Air Force denied Ms. Sieben's right to due process in two ways. First, it

impermissibly altered Ms. Sieben's medical records, preventing the evaluation

board from considering accurate, relevant information when it determined Ms.

Sieben's disability rating. Second, it failed to evaluate all of Ms. Sieben's combat-

related injuries, as required by law. As a result of these errors, the Air Force

violated Ms. Sieben's Fifth Amendment right to due process by assigning her a

disability rating that understated the scope of her injuries and denied her a

disability retirement in violation of 10 U.S.C. §§ 1201, 1214, 1216A(b).

A.   Ms. Sieben has a right to due process.

This Court has previously held that where disability benefits are

nondiscretionary and a veteran meets the eligibility requirements set forth by

statute, "such entitlement to benefits is a property interest protected by the Due

Process Clause of the Fifth Amendment to the United States Constitution."

Cushman, 576 F.3d at 1298 (discussing benefits administered by the Veterans

Administration). Here, Chapter 61, Title 10 U.S.C., and 10 U.S.C. § 1201, in

particular, are nondiscretionary statutes that confer disability benefits on service

members like Ms. Sieben who are unfit for continued service and who face

involuntary removal from service. Sawyer v. United States, 930 F.2d 1577, 1580

(Fed. Cir. 1991) ("[O]nce [the Secretary] finds a disability qualifying, he likewise has no discretion whether to pay out retirement funds. The word 'may' in section 1201 does not convey discretion whether or not to pay, it merely permits the Secretary to terminate a member's active duty early and tap the Treasury for the disability retired pay."). Therefore, Ms. Sieben is entitled to due process under the Fifth Amendment.

The Air Force is required to provide a full and fair hearing to veterans before they may be separated due to physical disabilities. Section 1214 provides: "No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if [s]he demands it." 10 U.S.C. § 1214. Therefore, Ms. Sieben is also entitled to a full and fair hearing by federal law.

B. Ms. Sieben was denied due process because a material and favorable medical record was altered.

This Court has held that "introduction and consideration of improperly altered medical records" is a violation of the veteran's constitutional right to a fair hearing. Cushman, 576 F.3d at 1300; see also Grillo v. Caughlin, 31 F.3d 53, 56-57 (2d Cir. 1994) (considering an altered urinalysis record in a criminal case was a violation of due process); Stemler v. City of Florence, 126 F.3d 856, 872 (6th Cir. 1997) (applying Grillo in civil context). The Air Force denied Ms. Sieben's right to due process when Dr. Barr's favorable 2009 report was replaced with an illegible version. As discussed above, this alteration was so extensive that it led the Air

36

Force's physical evaluation board and the Court of Claims to completely ignore it. See supra (discussing the extent of the alteration and the consequences on Ms. Sieben's disability rating); supra Figures 1-2.

This Court has previously held that the "consideration of [an] altered document instead of the unaltered document in adjudicating [the veteran's] claim [for disability benefits] was a violation of his constitutional right to a fair hearing." Cushman, 576 F.3d at 1290. Accordingly, Ms. Sieben requests a remand as she "is entitled to a new hearing without the presence of the altered document." Id. at 1300.

C.     Ms. Sieben was denied due process because the Air Force provided incomplete evidence of PTSD and traumatic brain injury and therefore failed to consider these conditions when it rated her disabilities.

The Air Force must follow applicable procedures when determining a service member's disability rating. 10 U.S.C. § 1216A(b). Military regulations are not optional: the Air Force is "bound to follow its own procedural regulations if it chooses to implement [them]." Murphy, 993 F.2d at 873 (citing Sargisson v. United States, 913 F.2d 918, 921 (Fed. Cir. 1990)). Ms. Sieben was denied a full and fair hearing because the Air Force failed to follow applicable procedures when it failed to evaluate all of her medical conditions. 10 U.S.C. § 1216A(b).

The Air Force is required to consider all of Ms. Sieben's medical conditions. 10 U.S.C. § 1216A(b) (stating that the service "shall take into account all medical

conditions, whether individually or collectively, that render [her] unfit to perform

[her] duties"). Furthermore, it is the Air Force's responsibility to schedule and

conduct all examinations that are necessary for fully evaluating all of Ms. Sieben's

Iraq-related conditions—she has no authority to direct these examinations herself.

DoDI 1332.38, ¶ E3.P1.2.3, E3.P1.2.5, A915-16; AFI 36-3212, ¶ 7.9, 7.10.2, 7.12,

7.16, 7.17, A900-04; see also 38 C.F.R. § 4.1 ("For the application of this

schedule, accurate and fully descriptive medical examinations are required, with

emphasis upon the limitation of activity imposed by the disabling condition.").

These examinations must be conducted so that a physical evaluation board can

determine whether each condition "cause[d] impairment of function to such extent

that [these conditions were] unfitting and compensable." 2008 DoD Policy Memo,

¶ E7.1.1, A935; DoDI 1332.38, ¶¶ E3.P1.1, E3.P1.2, A915; AFI 36-3212, ¶ 2.3.1,

A897; id. 7.1.1, A899; id. 7.6, A900; id. 7.13, A902; id. 7.16, A904; id. 7.24.1,

A905-06 (discussing the Air Force's responsibility to schedule and conduct

exams). Ms. Sieben was entitled to full evaluations for all of her combat-related

medical conditions so that the impairment she suffers is accurately reported to

those who are responsible for determining her degree of disability.

    Ms. Sieben repeatedly informed the Air Force that she was being treated for

PTSD and traumatic brain injury, but the Air Force consistently refused to evaluate

these conditions. On appeal in 2011, however, the Secretary declared that a "lack

of documentation . . . of symptoms or evidence of the treatment/medications needed," and "no evidence of functional cognitive deficits at the time [she was placed on the temporary disability retired list],"[17] precluded a determination that these were "unfitting conditions at the time of placement on the TDRL." A34-35. That is, the Secretary cited the Air Force's own failure to generate the documentation it was required to provide as the very reason Ms. Sieben was ineligible to receive a disability rating for PTSD and traumatic brain injury.

The Air Force's failure to follow the law and its own regulations is evidenced by the fact that the VA, which uses the exact same schedule for rating disabilities that the Air Force is required to apply, rated Ms. Sieben 70 percent disabled due to PTSD.[18] A137; see 10 U.S.C. 1216A(a)(1)(A) (requiring use of the VASRD). The Court of Claims accepted the government's argument that Ms. Sieben was to blame for evidentiary shortcomings. It held that Ms. Sieben "failed to present sufficient evidence to show that these conditions were unfitting at the time she was placed on the TDRL." A11. The Court of Claims, like the Air Force, held Ms. Sieben accountable for the Air Force's failure to abide by the DoD and its

---

[17] The Secretary of the Air Force erroneously stated that PTSD and traumatic brain injury were evaluated, as required. They were not. A35.

[18] In addition to this rating, the VA granted her a 100 percent disability rating for her inability to follow a substantially gainful occupation. A543-44.

own regulations requiring it to fully evaluate Ms. Sieben in order to provide competent and complete evidence of PTSD and traumatic brain injury.

The Air Force's failure to examine Ms. Sieben's PTSD and traumatic brain injury in 2006 has permanently precluded her from having these conditions properly evaluated. Where, as here, it is impossible to determine what the outcome would have been had the Air Force evaluated Ms. Sieben's PTSD and traumatic brain injury, it would be appropriate for this Court to reverse the Air Force's denial of Ms. Sieben's claim for 100 percent disability. See Wagner v. United States, 365 F.3d 1358 (Fed. Cir. 2004) (holding that reversal is appropriate where the effect of the error is "not quantifiable and incapable of review"). At a minimum, however, this Court should remand Ms. Sieben's case to the Court of Federal Claims so that it may determine whether reversal is appropriate.

## CONCLUSION

Ms. Sieben respectively prays that this Court reverse the decision of the Court of Federal Claims and hold that she is entitled to a rating of 100 percent disabled. In the alternative, Ms. Sieben respectfully requests that this Court remand the case so that she can have a full and fair hearing in which all of her evidence will be considered and the proper legal standard applied.

Respectfully submitted,

Dated:  July 19, 2013

/s/ Harry A. Sieben, Jr.
Harry A. Sieben, Jr.
SIEBEN, GROSE, VON HOLTUM &
CAREY
901 Marquette Avenue, Suite 500
Minneapolis, MN 55402-3205
(612) 333-9781

*Attorney for Plaintiff-Appellant*
*Mary V. Sieben*

CASE PARTICIPANTS ONLY

# ADDENDUM

# ORIGINAL

## In the United States Court of Federal Claims

No. 11-878C
(Filed: March 15, 2013)

FILED

MAR 15 2013

U.S. COURT OF
FEDERAL CLAIMS

```
************************************
                                   *
MARY V. SIEBEN,                    *
                                   *
                Plaintiff,         *
                                   *
     v.                            *
                                   *
THE UNITED STATES,                 *
                                   *
                Defendant.         *
                                   *
************************************
```

### OPINION AND ORDER

This is an action for review on the administrative record of a military disability retirement pay and benefits case under 10 U.S.C. § 1201. Plaintiff, a former colonel in the Air National Guard, was found unfit for continued military service with the Air Force and was therefore discharged with a permanent disability rating of 20 percent.

Plaintiff presents numerous arguments in support of her claim for a disability rating of 100 percent. She challenges the procedures whereby the Air Force determined that she was entitled to a 20 percent rating, and she also attacks the substantive merits of that determination. This case involves what the Air Force has described as "inconsistent" evidence, and Plaintiff takes issue with the conclusions reached by the Air Force because it resolved many of these inconsistencies against Plaintiff. While the Court understands Plaintiff's disappointment with these resolutions, it does not sit as a "super correction board," and as such, its role in review is limited. Here, the Court finds that there is sufficient evidence to support the Air Force's findings.

The matter comes before the Court on the Government's motion for judgment on the administrative record ("AR") under the Rules of the Court of Federal Claims ("RCFC") Rule 52.1 ("Gov't Mot.") and Plaintiff's cross-motion for same ("Pltf. Mot.") (collectively, the "Judgment Motions"). The Government's motion is GRANTED, while the Plaintiff's motion is DENIED. Judgment will be entered accordingly.

## I.    Background

In order to put the facts into context, it is important to understand the framework under which military disability determinations are made. The Court, therefore, begins with a brief

discussion of the statutory and regulatory framework under which this case was decided below. With that framework established, the Court recites the facts pertinent to Plaintiff's case. Finally, the Court describes the procedural background of this matter.

### a. Statutory and Regulatory Framework

Pursuant to 10 U.S.C. § 1216, the Secretary of the Air Force ("Secretary") is given the power to determine whether a service member is fit for active duty. Conversely, the Secretary may retire or separate a service member if a disability renders the member unfit to perform his or her military duties. *Id.* The Air Force uses the disability evaluation system to determine a service member's fitness for duty and the severity of any disability. The disability evaluation system runs primarily through two boards of review: the medical evaluation board ("MEB") and the physical evaluation board ("PEB"). *See* DoD Instruction ("DODI") 1332.38, *Physical Disability Evaluation* (Nov. 14, 1996); *Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act of 2008* (Pub. L. 110-181) (Oct. 14, 2008) ("*Policy Memorandum*").

At the outset, if after conducting a medical exam, an attending physician finds one or more conditions that are cause for referral, the physician forwards a patient's medical records to the MEB. The MEB is composed of three physicians. These physicians determine whether service members should be returned to duty or referred to the PEB. Air Force Instruction ("AFI") 41-210, *Patient Administration Functions* (Nov. 29, 2010), ¶¶ 10.1.1, 10.2.2, 10.7.3.

The PEB is composed of three members and must include at least one physician and one officer. The PEB's duty is to evaluate the service member's fitness for duty. If the service member is deemed unfit, the PEB is also responsible for determining the degree of impairment due to disabilities incurred during active duty. AFI 36-3212, *Physical Evaluation for Retention, Retirement, and Separation*, Feb. 2, 2006 (Through Change 2, November 27, 2009), ¶¶ 3.1, 3.8 ("*Physical Evaluation*"). The degree of impairment (rating) is determined in accordance with the Department of Veterans Affairs Schedule for Rating Disabilities ("VASRD"). *See id.* at ¶ 1.7; *Policy Memorandum* at ¶ E7.1.2. A service member must be deemed "unfit for continued military service" in order to receive a disability rating. *Physical Evaluation*, ¶ 1.9.

Upon referral to the PEB, a case is first considered by an informal PEB ("IPEB"). The review here is based on the record and a hearing is not allowed. *Id.* at ¶ 3.33. If, after the IPEB, the service member still objects to the findings, the matter is referred to a formal PEB ("FPEB"). The FPEB allows for a non-adversarial hearing with witness testimony and representation by counsel. *Id.* at ¶ 3.38.

If the service member objects to the FPEB's findings, he or she may submit a rebuttal to the Secretary of the Air Force Personnel Council ("SAFPC"). The SAFPC consists of five members, with at least one (and "normally two") members being Medical Corps officers. *Id.* at ¶ 5.6. The SAFPC reviews the record from the PEB, plus any additional documents submitted by the member or requests by SAFPC. *Id.* at ¶ 5.8. Hearings only occur "at the specific invitation of the [S]AFPC." *Id.*

2

If the service member objects to the SAFPC's findings, he or she may appeal to the Air Force Board for Correction of Military Records or to the Physical Disability Board of Review. *Id.* at ¶ 5.20; *see also* 10 U.S.C. §§ 1552(a)(1), 1554(a). Alternatively, a service member may challenge a decision of the SAFPC in this Court. *See, e.g., McHenry v. United States*, 367 F.3d 1370, 1376 (Fed. Cir. 2004).

If the member is found unfit due to a condition that is determined to be not yet stable or permanent, the member is placed on the temporary disability retirement list ("TDRL"). *See* DoDI 1332.38 at ¶ E3.P6.1. An unstable condition is one which will change enough within the next five years to warrant a change to the disability rating or finding of fitness. *Id.* at ¶ E3.P6.1.1. Members that have been placed on the TDRL are periodically reevaluated by an IPEB to determine whether the condition has stabilized. If the condition has done so, the IPEB assigns a permanent disability rating. *Id.* at ¶ E3.P6.2.5.3. From this stage, a service member may follow the same review procedure described above.

A condition that is first diagnosed when a service member is already on the TDRL is only compensable under one of two circumstances. The first is if the late-diagnosed condition is unfitting and caused by the condition for which the member was originally placed on the TDRL or is related to the treatment of that condition. *Id.* at ¶ E3.P6.2.4.2. The second is where, even though not diagnosed until later, the condition was unfitting at the time the service member was placed on the TDRL. *Id.* at ¶ E3.P6.2.4.3.

### b. Statement of Facts

#### i. Plaintiff's Service and Medical Conditions

Plaintiff, a former attorney, served in the Air Force, Air Force Reserve and Air National Guard for a combined 27 years. In August of 2004,[1] at the age of fifty, she was deployed to Iraq. Her assignment ran until December of 2004.

Plaintiff's assignments required her to travel the country by airplane, helicopter and convoy. Plaintiff was required, at most times, to wear body armor weighing between 35-40 pounds and to carry a weapon and other equipment, as required. During her time in Iraq, Plaintiff was exposed to mortars, car bombs, anti-aircraft artillery and surface-to-air missiles. Despite this exposure, Plaintiff was never directly involved in combat. AR 184, 428.

Shortly before leaving Iraq, Plaintiff began to seek treatment for lower back pain. At the time, she attributed this pain to wearing heavy body armor and other gear. *See* AR at 800, 830-31. One week before her eventual placement on the TDRL, Plaintiff completed a medical self-assessment wherein she indicated that she was "injured during tour in IRAQ from carrying too

---

[1] Some records reflect that Plaintiff was not deployed in Iraq until October 8 or 9, 2004. *See, e.g.*, AR 427, 800, 830, but another record reflects that she was deployed in August of 2004. *See* AR 184. It appears that Plaintiff may have been sent to Fort Bliss, Texas and Kuwait prior to entering Iraq. *See* AR 842. However, because the exact date has no particular bearing on this case, the Court will treat August of 2004 as the date of deployment.

much weight while running, jumping, etc." AR 436 (capitalization in original document). Her assessment does not mention any specific incident.

Later, Plaintiff began presenting a different account for the source of her injury: rather than the long-term wear of heavy gear, her back pain could be traced to a single incident in which she exited a landed C-130 cargo plane before the ramp was fully deployed. AR 185, 189, 285, 453, 455, 461, 733, 746, 800. She fell up to three feet, but landed on her feet, and continued running from the plane to join her unit. *Id.* Plaintiff claimed that this incident caused her immediate pain in her lower back, numbness in her legs, confusion, and temporary urinary incontinence. AR 285. She did not seek medical care for any of these symptoms, and in fact claimed in her post-deployment checklist that she had never suffered from numbness in her lower extremities. AR 428. Still, she alleges that she suffered a traumatic brain injury ("TBI") from either the ramp incident or her exposure to mortar fire. AR 185, 189, 455-56, 516, 567, 641, 679.

In 2006, Plaintiff first relayed another incident in which she claims she drew her weapon on some Middle-Eastern men. AR 376. She believed that the men were watching her, and perceived them as a threat. She therefore drew her weapon and "stared them down". The men left her alone, but Plaintiff refers to this incident as a "near kidnapping." *Id.*

Plaintiff's records also mention post-traumatic-stress disorder ("PTSD"). The AR includes a document from Veterans Affairs ("VA"), entitled "Problem List," which reports PTSD. AR 244-45; AR 224. However, Plaintiff's VA ratings do not demonstrate a diagnosis of PTSD, but rather "[a]nxiety disorder with features of [PTSD] and major depression." Compl. at 4. This distinction is reflected in other records in the AR, which indicate that Plaintiff was diagnosed with anxiety disorder with features of PTSD. AR 110; *see also* AR 383; AR 374.

### ii. Plaintiff's Placement on the TDRL and Subsequent Separation

Plaintiff continued to receive care for her back condition after she returned from Iraq. AR 800. She was eventually referred to the MEB for evaluation, the MEB determined that Plaintiff's back condition was potentially unfitting on November 5, 2005, and she was referred to the IPEB. On December 9, 2005, the IPEB found that Plaintiff's back condition rendered her unfit for continued service and rated her at 10 percent. AR 788.

Plaintiff agreed with the finding of unfitness, but requested FPEB consideration in order to challenge the 10 percent rating. Specifically, Plaintiff asserted that "the IPEB failed to understand the significance of the several diagnoses *affecting my spine*, failed to understand the severity of my *spinal injuries*, and failed to properly rate the one VA Diagnostic Code it did consider." AR 717 (emphasis added). Plaintiff proceeded to explain the flaws she saw in the IPEB's analysis, but concentrated solely on her spinal condition. AR 717-18. These injuries were, in Plaintiff's analysis, caused by "the weight I ran and jumped with, jarring my back." AR 717. She did not mention TBI or PTSD as bases for alternative rating.

On February 22, 2006, the FPEB directed that Plaintiff be placed on the TDRL with a temporary rating of 100 percent for her back condition, due to unemployability. AR 709.

Specifically, the Board opined that Plaintiff would be rated at 60 percent under the VASRD, but that her symptoms were severe enough to warrant a 100 percent rating because her condition was "'sufficient to render it impossible to engage a substantially gainful occupation' outside the military environment." AR 710.

Naturally, Plaintiff concurred with the 100 percent rating, but the disparity between the two boards led to a review by the SAFPC. AR 688. The SAFPC noted that it had the option of rating Plaintiff's spine condition either based upon the duration of *incapacitating* episodes of impairment she had experienced over the preceding 12 months or her measured spine range of motion, whichever more appropriately characterizes her functional impairment." AR 684 (emphasis in SAFPC memorandum). The SAFPC acknowledged that Plaintiff had been placed on convalescent leave for six weeks, but stated that the entirety of that time could not be automatically equated to a period of incapacitation. Given the posture of Plaintiff's case, however, the SAFPC "rendered the benefit of doubt in the [Plaintiff's] favor." *Id.* The SAFPC observed that it was "optimistic that the [Plaintiff] will not be forever restricted from employment opportunities in the legal profession based solely upon her spondylolisthesis." AR 684-85. This observation was made in light of "an historical account of similar or subjectively more severe cases adjudicated in the past." AR 685. The SAFPC also noted that "disability ratings awarded when a member is first placed on the TDRL are often generous to allow for the fluctuating morbidity attendant in any newly diagnosed condition in the earlier stages of treatment." Based on its analysis, Plaintiff was placed on the TDRL on April 25, 2006. AR 689.

After placement on the TDRL, Plaintiff sought treatment at the Minneapolis VA Medical Center post-traumatic-stress recovery ("PTSR") clinic. AR 373. The intake interview was conducted on September 13, 2006. *See* AR 373-85. Plaintiff reported anxiety related to a "near kidnapping" in Iraq. AR 383. However, the clinic diagnosed Plaintiff with "[a]nxiety disorder not otherwise specified with subclinical post-traumatic-stress disorder." AR 382. Plaintiff did not meet all the criteria required for a diagnosis of PTSD. *Id.* It appears that Sieben's treatment at the clinic continued from 2006 until at least 2010.

In 2008, Plaintiff received orders to report for a physical examination of her back condition for another IPEB. The doctor noted that Plaintiff performed light aerobics four to five times a week, managed her back pain with anti-inflammatories, and that she denied numbness, tingling, or incontinence. AR 640.

Before the IPEB's reevaluation, Plaintiff requested that the board rate her for PTSD and TBI. AR 679. The IPEB denied the request, instead finding that, while Plaintiff's spinal condition had improved, it had not yet stabilized. AR 628. The IPEB therefore recommended that Plaintiff continue on 100 percent disability.

Plaintiff's next reevaluation exam took place in late 2009. Once again, Plaintiff raised her concerns over PTSD and TBI, and once again, the IPEB did not rate her for those alleged conditions. Plaintiff's orthopedic exam shows that she scored a five out of five on all strength tests and that her range of motion was not limited, but that she "did have pain out of proportion upon palpitation of the spinous processes of the lumbar spine." AR 20. The report noted that Plaintiff's condition was "appropriately managed with the current therapy," and determined that

she would "be considered qualified for worldwide duty," with the caveat that an administrative role would be most appropriate. *Id.*

After reviewing the reevaluation, the IPEB determined that Plaintiff's condition had improved and stabilized. AR 564. In light of her current condition, the IPEB rated Plaintiff at 10 percent. The IPEB recommended that Plaintiff be taken off the TDRL and medically discharged with a permanent rating of 10 percent. *Id.*

Unhappy with her rating, Plaintiff again requested FPEB consideration. The hearing was scheduled between May 18 and May 25, 2010, and the Plaintiff's husband accompanied her to the hearing. AR 555. Air Force Lawyer Rick Becker helped Plaintiff gather and present additional pertinent medical records. *See* AR 449.

One piece of evidence submitted with Mr. Becker's help was a March 1, 2010 evaluation by physical therapist John Hovde. The evaluation showed that Plaintiff could independently care for herself, read, and use a computer, but it also concluded that Plaintiff "did not demonstrate the abilities to work on a full-time basis." AR 464.

Plaintiff also submitted a March 30, 2010 neurological report by Dr. Steven Noran. Dr. Noran's notes reflect that Plaintiff had ceased using the anti-inflammatories that had been used to good effect in 2008. AR 455. Dr. Noran observed that Plaintiff's cognitive functioning was normal and that she was "able to recall events with quite good detail." The vast majority of Dr. Noran's observations noted normal testing or the lack of any extraordinary symptoms. *See* AR 456. He noted that "the underlying emotional components of all of these problems is [sic] a major and significant problem for" Plaintiff. *Id.*

Plaintiff also submitted numerous VA treatment records to the board. One of these records, an evaluation by a neuropsychologist dated January 4, 2010, offers a brief history of Plaintiff's conditions. It notes that Plaintiff did not seek treatment for TBI or any cognitive issues from 2004 to 2006. AR 188. Indeed, Plaintiff did not even allege a brain injury of any kind until "an extended period after deployment," after she had learned that other veterans had claimed similar injuries. AR 185. Based on the doctor's summary, Plaintiff claimed in October of 2007 that mortar fire had caused a TBI, but she denied that the mortar fire ever caused loss of consciousness, cognitive difficulties, headaches, or a need for medical treatment. AR 189. Dr. Nelson observed that "[p]erformance" and "effort" were diminished in certain tests, "suggest[ing] that aspects of the neuropsychological profile under-estimate true level of cognitive ability." *Id.* Numerous cognitive tests showed Plaintiff operating within the normal to high-normal range. AR 189-92. The evaluation observed that her cognitive function at the time of testing was "strikingly consistent" with pre-injury levels. *See* AR 191-92. Dr. Nelson also noted that Plaintiff's physical complaints "may in part reflect underlying physiologic issues but may also represent at least partial manifestation of emotional distress… Emotional symptoms are likely to contribute to a subjective experience of cognitive limitation." AR 192.

With all of these records, and many others, the FPEB determined on June 7, 2010 that Plaintiff's spinal condition was stabilized and warranted a rating of 10 percent. AR 408. The board's determination is explained in detail. *See* AR 409-412. It noted that the records showed

that Plaintiff's symptoms were controlled by medicine and that she had not sought care for her back condition since 2005. AR 412. The records also showed "questionable poor effort versus lack of cooperation," and that an evaluation had determined that "she would be able to perform predominantly administrative duties in the military." *Id.* The board determined that Plaintiff's TBI and PTSD claims were not compensable because they were not diagnosed at the time she was placed on the TDRL, nor were they caused by her back condition. AR 411.

Plaintiff did not agree with the outcome of the FPEB and requested a hearing with the SAFPC. AR 419. Many of Plaintiff's arguments from her first letter to the SAFPC are mirrored before this Court, so they will not be summarized here. In addition, Plaintiff sent a second letter with attached documentation. Many of the documents were the same VA records she submitted to the FPEB, but Plaintiff also added a February 2008 report from Dr. Alford Karayusuf. AR 128-130. This report is notable because it observes that *Plaintiff* told Dr. Karayusuf she had been diagnosed with PTSD, and Dr. Karayusuf followed this statement with a diagnosis of PTSD. AR 130. The Government observes that this report is the only affirmative diagnosis of PTSD in the AR, and it was precipitated by Plaintiff's statement – not supported by anything else in the record – that she had been previously diagnosed with PTSD.

On February 15, 2011, the SAFPC concurred with the FPEB's recommendation to discharge Plaintiff with severance pay, but it increased her disability rating from 10 to 20 percent. AR 6-7. The board agreed that Plaintiff was not unemployable. AR 7-8. Notably, the board did not cast doubt on Plaintiff's diagnosis of PTSD, but like the FPEB, the SAFPC determined that PTSD was not compensable because the condition was not unfitting at the time Plaintiff was placed on the TDRL, nor did it arise from the condition for which Plaintiff was placed on the TDRL. The SAFPC did find that Plaintiff's "antalgic gait"[2] merited a rating of 20 percent under the VASRD, and therefore increased her rating. It noted that the record contained "no evidence of incapacitating episodes that meet criteria specified in the VASRD, as was the case during her MEB evaluation." AR 8. Thus, Plaintiff was removed from the TDRL and separated with a disability rating of 20 percent.

### c. Procedural History

Plaintiff filed her complaint on December 14, 2011. In April of 2012, the Government filed, in one document, a motion for partial dismissal pursuant to Rule 12(b)(6) and a motion for judgment on the AR. The motion for partial dismissal was based on the Government's reading of the Complaint as stating both a claim for wrongful termination and seeking a higher disability rating. *See* Gov't Mot. at 28.

Prior to submitting her cross-motion and response to the Government's motion on the AR, Plaintiff contested the motion to dismiss, arguing that she never raised a wrongful termination claim. She also indicated that she believed certain records were missing from the AR. In light of Plaintiff's representations, the Court denied the Government's motion to dismiss, as moot, and stayed briefing on the Judgment Motions in order to provide Plaintiff the opportunity to move for leave to supplement the record.

---

[2] "Antalgic" means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 97 (32nd ed. 2012) ("DORLAND'S").

Before the Court issued the Order denying the motion to dismiss and staying briefing on the Judgment Motions, Plaintiff filed her cross-motion and response. Appended to this filing were twelve exhibits which Plaintiff claimed were either parts of the administrative record that were not provided to the Court or which she claimed were necessary to her case. Plaintiff then complied with the Court's Order requiring her to move for leave to supplement the AR by requesting that the Court strike the exhibits attached to her response because they were not properly redacted. She then requested leave to supplement the record with thirteen exhibits – the original twelve, now properly redacted, and a new thirteenth exhibit. On December 13, 2012, the Court granted Plaintiff's motion, in part, and denied, in part. The Court lifted the stay on briefing, and the final briefs were filed by both parties.

## II. Standard of Review

The Court's review of military disability and benefits cases is normally limited to the administrative record. *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006). The Court may not disturb the military's decision unless it is "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005); *see also Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983). "[T]he standard of review does not require a reweighing of the evidence, but a determination whether the *conclusion being reviewed* is supported by substantial evidence." *Heisig*, 719 F.2d at 1157 (emphasis in original). The court cannot substitute its judgment for that of the examining physicians, MEB, PEB or SAFPC. *Id.* at 1156-57. Rather, a court may set aside an agency's decision if the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In addition, "military administrators are presumed to act lawfully and in good faith, like other public officers, and the military is entitled to substantial deference in the governance of its affairs." *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993). Thus, the plaintiff bears the burden of overcoming the "strong, but rebuttable, presumption" that the military has properly discharged its duties. *See Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Sanders v. United States*, 219 Ct. Cl. 285, 594 F.2d 804, 813 (1979) (citations omitted)). A challenging party must present clear and convincing evidence in order to overcome the presumption of good faith by the Government. *See, e.g., Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). "Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001).

## III. Analysis

Broadly put, Plaintiff's arguments fall into two general categories. Falling in the first category are those arguments that are largely procedural, while the second category are substantive issues that center on the Air Force's application of the facts in this case. The Court addresses each in turn.

### a. Procedural Issues

"No member of the Armed Services may be retired or separated for physical disability without a full and fair hearing if he demands it." 10 U.S.C. § 1214. Citing a law review article by the late Judge Henry Friendly, Plaintiff argues that the following elements of a full and fair hearing were lacking in the proceedings below: an unbiased tribunal; notice of the proposed action, the ground and an opportunity to respond; and opportunity to present evidence and call witnesses; the right to be represented by counsel; and the right to written findings of fact and reasons for the decision. Pltf. Mot. at 23. However, recalling the presumption of good faith in the actions of military administrators, *see Dodson*, 988 F.2d at 1204, this Court finds none of Plaintiff's procedural arguments persuasive.

### i. Bias

In support of her position that she was not heard by an unbiased tribunal, Plaintiff argues that the SAFPC's 2006 memorandum influenced future PEB rulings by stating its "position" that, "based upon an historical account of similar or subjectively more severe cases adjudicated in the past," AR 687, Plaintiff would eventually be fully employable. Pltf. Mot. at 24 (citing AR 687). Plaintiff further notes that the 2008 IPEB and 2010 FPEB both cited this memorandum in rating her. Pltf. Mot. at 24 (citing AR 12-13; AR 628-29). The Government argues that Plaintiff has presented no evidence of improper influence.

The Court has found nothing improper in the AR. Rather, it appears that all proper procedures were followed. Further, there is a presumption that the Government lawfully discharged its duties, and the burden is on Plaintiff to overcome that presumption. She has failed to do so and, insofar as she has implied that later references to the memorandum indicate improper influence, the Court notes the following. First, the 2008 IPEB rated Plaintiff at 100 percent, such that there is no evidence that the memorandum influenced the IPEB to rate Plaintiff lower than it thought proper. Second, the 2010 FPEB's reference to the memorandum is limited to two sentences in the middle of a very thorough and lengthy discussion of Plaintiff's medical history. The memorandum is by no means the only, or even a major, basis for the FPEB's rating decision. Given that Plaintiff has demonstrated nothing improper with respect to the SAFPC's 2006 memorandum, the Court sides with the Government.

Plaintiff also argues that the FPEB was biased because it was "mocking and demeaning of plaintiff, her service and her injuries." Pltf. Mot. at 24. While the Court understands Plaintiff's disappointment at being denied complete disability, it does not see anything mocking or demeaning on the FPEB's analysis of Plaintiff's claim. The FPEB's job is to analyze claims and determine whether or not they have merit. The denial of a claim does not make a decision mocking or demeaning.

Plaintiff next argues that Col. Brian McCrary, the medical representative on the FPEB, was biased because he once worked for "insurance companies and businesses seeking to undermine injured people's claims, with physical exams and litigation support." She also points to Col. McCrary's resume, which describes his duties on the Board as including "serv[ing] as the medical expert opinion for all cases presented to the Board." AR 445. With respect to the former complaint, Col. McCrary's prior work record is not relevant here, especially considering the detailed explanation provided by the FPEB. As to the latter, the Government observes that it is not improper for Col. McCrary to refer to himself as the board's medical expert because "[o]ne member of the formal PEB must be a medical officer," and Col. McCrary is just such an officer. Gov't Resp. at 16-17. The Court finds that there is no actual evidence that Col. McCrary was biased.

Plaintiff also claims that Lt. Col. Lisa Rascoe was biased. To this end, Plaintiff notes that "the PEB acted as a self-appointed *investigative unit*, rather than 'a fact-finding body that *investigates* the nature, origin, degree of impairment, and probably permanence" of a service member's condition. Pltf. Mot. at 25 (emphasis added). Through an internet investigation, the Board found pictures of Plaintiff attending a log building school. The pictures the Board found were included in the record as Exhibit V, which was placed in the record after Plaintiff's hearing. Plaintiff claims that this evidence should not have been considered because she was not given an opportunity to respond to the evidence, and she was not given the opportunity to call witnesses in opposition to that evidence. To the contrary, the record reflects that Plaintiff had an opportunity to respond to the evidence presented. *See* AR 410 ("The FPEB acknowledges Col Sieben's testimony that she was an observer at the log building school."). The Court, having had the opportunity to consider Plaintiff's motion to supplement, also notes that its opinion on that issue reflects the fact that one of Plaintiff's proposed (and excluded) exhibits also shows that her husband testified about the log building trip. *See* Docket No. 22 at 8. Thus, she not only testified herself in response to Exhibit V, but she offered her husband's testimony as well. Plaintiff's claims of an inability to respond to evidence are factually inaccurate, and are therefore, not persuasive.

Plaintiff also argues that the composition of the panel necessarily established a bias against her. The root of this argument lies in the fact that an officer junior to Plaintiff presided over her board. Specifically, DoD instructions state that the FPEB "will consist of a president who should be a colonel/naval captain/civilian equivalent, a field grade personnel officer… and a senior medical officer," so Plaintiff complains that her board was not properly composed when a "junior officer" (i.e., lieutenant colonel) presided. Pltf. Mot. at 27. However, the DoD instruction also provides that "Secretaries of the Military Departments may adjust this composition to enhance the adjudication process." *Policy Memorandum* at ¶ E3.P1.3.10.2. The Government responds that the Air Force has adjusted the board's composition, such that the board president need only be a lieutenant colonel. AFI 36-3212 (Through Change 2, November 27, 2009), ¶¶ 3.7, 3.8. Thus, the board was not improperly composed.

Plaintiff's burden here is to present clear and convincing evidence of the Government's bad faith, else it is presumed to have acted in good faith and in accordance with the law. Plaintiff has failed to present any evidence demonstrating the Government's bias. In such a

circumstance, the Court must presume that the Air Force acted in accord with the law, and therefore finds that the Air Force was not biased against Plaintiff.

### ii. Notice regarding PTSD and TBI

Plaintiff next argues that she has a right to be given notice of the case against her and an opportunity to make her own case. She asserts that she was denied that opportunity when the agency "argued for the first time that PTSD and TBI were not 'unfitting at the time of her placement on the TDRL.'" Pltf. Mot. at 28. She also complains that the Government failed to appropriately consider the numerous records she has presented from non-military sources. The Government responds that Plaintiff waived these arguments when she opted to pursue litigation in this court, rather than appealing to the Air Force Board for Correction of Military Records ("AFBCMR") in order to supplement her case with more records.

Initially, the Court does not believe that Plaintiff went entirely without notice that her alleged PTSD and TBI conditions would not be rated. In 2008, she requested ratings for those conditions, AR 679, but the IPEB's ratings decision was limited to the previously-rated back condition, with no reference to the newly-raised cognitive conditions. AR 628. The IPEB's failure to rate these conditions in 2008 should have been apparent to Plaintiff at that time.

Even so, the Air Force considered evidence that showed that Plaintiff, at around the time she was placed on the TDRL, "responded to treatment with 'good results'." AR 7. The Court found this conclusion corroborated by the evidence with which Plaintiff sought to supplement the administrative record. *See* Docket No. 22 at 6. All told, the Air Force considered the evidence available to it and concluded that Plaintiff's alleged cognitive conditions did not render her unfit for service because they were adequately controlled by medication.

This brings the Court to the Government's argument, which is that Plaintiff has waived her right to bring the argument that she should have been able to submit additional records pertaining to her mental conditions because she could have appealed to the AFBCMR but instead opted to pursue her claim here. This Court has previously held that the decision of a party to forego the exhaustion of administrative remedies in order to bring suit here "is not without consequences." *Bateson v. United States*, 48 Fed. Cl. 162, 164 (2000) (Damich, J.). Instead, this Court has determined that proceeding in the Court of Federal Claims prior to exhausting administrative options evidences satisfaction with the existing record. *Id.* Here, Plaintiff decided not to pursue her claim with the AFBCMR, where she could supplement the record, but to pursue her claim here. The consequence of that decision is that she cannot claim dissatisfaction with the record which the Air Force considered.

In light of the foregoing, the Court cannot conclude that Plaintiff lacked notice as to her burden. She raised new conditions during the pendency of her TDRL listing, but failed to present sufficient evidence to show that these conditions were unfitting at the time she was placed on the TDRL. Contrary to Plaintiff's position, the evidence of record and even her proposed (and excluded) evidence supports the Air Force's finding that, even if she did have a mental condition, it was not unfitting at the time she was placed on the TDRL.

### iii. Opportunity to present evidence and witnesses

Next, Plaintiff argues that she was denied the right to have her case "determined by the issues and evidence she presented" with respect to her physical condition. Pltf. Mot. at 28. She cites a paragraph of the SAFPC decision in support of her belief that the Air Force decided her case only "on evidence defendant found favorable to its position." *Id.* at 29. Based on this paragraph, she concludes that the SAFPC neither "reviewed [n]or considered plaintiff's experts' opinions, the results of her FCE [Functional Capacity Evaluation] or WRT [Work Rehabilitation Testing], and the full extent of the civilian records she has provided since 2004." The Government responds that the board is not required to refer to every piece of evidence it considered in reaching its decision. Gov't Resp. at 19.

The Court once again sides with the Government. The paragraph upon which Plaintiff relies states that the SAFPC reviewed "all facts and evidence in the case, to include" certain expressly-identified documents. AR 7. While the listed documents don't include those which Plaintiff cites, this paragraph does not suffice to overcome the presumption of regularity in government actions. Simply put, the word "include" does not necessarily limit the evidence reviewed to only those documents expressly referenced. Instead, this Court agrees with the intuition that an agency is not required to list every piece of evidence before it in reaching its decision. *See Bosch v. United States*, 27 Fed. Cl. 250, 268 (1992) (Horn, J.) ("Simply because the BCNR did not explicitly list the name of every therapist visited by plaintiff in its 1987 or 1989 decisions, does not mean that the BCNR ignored that evidence."). The conclusions reached by the SAFPC are supported by sufficient evidence, even if it resolved several inconsistencies against Plaintiff. Plaintiff's citations to other parts of the record do not overcome the presumption that the SAFPC resolved those inconsistencies in accord with the law and in good faith.

### iv. Representation by counsel

Plaintiff next complains that she was denied the services of a government-appointed attorney for her 2009 IPEB and SAFPC, as required by DoD policy. Pltf. Mot. at 29 (citing *Policy Memorandum* at ¶ E8.8.1.1). She asserts that she did not receive the services of an attorney or PEBLO (PEB liaison officer) until she arrived for the FPEB. She also claims that this attorney was not properly trained by the Air Force, so that "everyone in the room knew the rules except plaintiff and her attorney." *Id.* She also claims that she was not represented by counsel during the SAFPC appeal. Her argument revolves around the position that, if she had been represented by counsel throughout the process, she would have included a number of documents in her filings that were not included at various times in the process.

Plaintiff's argument misrepresents the record. As the Government points out, in 2005 Plaintiff signed a form in which she indicated her understanding that the PEBLO was available to her throughout the process. AR 843. The Government also observes that Mr. Becker was involved at several points in Plaintiff's case. *See, e.g.*, AR 419, 449, 707, 715-16; *see also* AR 29 (observing that Plaintiff was represented by her "civil service AF attorney" at the FPEB). Thus, as the Government points out, Plaintiff had a PEBLO available to her throughout the

process, and to the extent that she did not take advantage of the PEBLO, that failure lies with her and not the Air Force.

Further, the Court agrees with the Government that, even if she went unrepresented by counsel, Plaintiff has failed to show that these procedural errors gave rise to any harm. It is well-established in military cases that a plaintiff must show that the alleged errors led to harm – here, her allegedly insufficient disability rating. *See Christian v. United States*, 337 F.3d 1338, 1343 (Fed. Cir. 2003). To the extent that under-representation resulted in the 10 percent rating during Plaintiff's final appearance before the PEB, the Government is correct in noting that the SAFPC corrected that error in assigning Plaintiff a 20 percent rating. Insofar as Plaintiff claims that adequate representation would have resulted in the submission of certain additional documents to her record, that issue is adequately addressed in the Court's opinion on Plaintiff's motion to supplement the administrative record. The Court found that none of the documents absent from the record were necessary for an effective review, largely based on the fact that none of them refuted the Air Force's findings.

The AR shows that Plaintiff was aware of her PEBLO and that he frequently helped her pursue her claim. Plaintiff's claim of under-representation is simply not supported by the record. As such, her representation is no basis for this Court to disturb the Air Force's findings.

### v. Written findings

Plaintiff's final procedural complaint, rooted in 10 U.S.C. § 1222, is that the Air Force did not provide its findings "in an orderly and itemized fashion," but rather offered only conclusory opinions with "no insight into what objective evidence" the FPEB and SAFPC decisions relied upon. Pltf. Mot. at 30. To the contrary, the FPEB fully and thoroughly discussed Plaintiff's case, with a detailed analysis of many of the records, reports, and arguments before it. *See* AR 10-13.

With respect to the SAFPC findings, this Court finds persuasive the reasoning applied by Judge Sweeney when she determined that § 1222 does not apply to SAFPC rulings. *See Peterson v. United States*, 104 Fed. Cl. 196, 212 (2012). In that case, Judge Sweeney reasoned that § 1222 was limited to decisions of the PEB, "whether during the PEB's 'initial consideration' of a case or its 'subsequent consideration' after appeal or any 'other circumstance' that requires it to revisit a case." *Id.* Following that reasoning, the Air Force "fulfilled its statutory obligation under 10 U.S.C. § 1222 by conveying findings and conclusions of the PEB in an orderly and itemized fashion." *Id.* at 213. Meanwhile, the SAFPC's decision clearly and concisely expresses the basis for its findings. There is no procedural error here.

### b. Substantive Issues

With the procedural issues addressed, the Court now turns to Plaintiff's substantive disputes in this litigation. Despite presenting a number of arguments in her cross-motion, Plaintiff recognized in her reply that "[t]he case… boils down to one issue." Pltf. Reply at 1. That issue, put broadly, is whether the Air Force properly considered Plaintiff's request to be rated unemployable when it separated her from service. She believes that the Air Force failed to

properly consider three avenues under which she claims she could be found 100 percent disabled. Plaintiff relies upon 38 C.F.R. § 4.16(b), 38 C.F.R. § 3.321(b), and 38 C.F.R. § 4.16(a) in support of her position.

### i. 38 C.F.R. § 4.16(b)

Plaintiff relies upon 38 C.F.R. § 4.16(b) for the proposition that she should be rated at 100 percent, regardless of the VASRD calculations made by the FPEB or SAFPC. Pursuant to the cited provision, "all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled." 38 C.F.R. § 4.16(b). Plaintiff refers the Court to several records which, she argues, can only lead to a conclusion that she is totally disabled, and therefore entitled to a 100 percent rating.

The Government responds that a finding of employability is one of fact, such that this Court must review the Air Force's determinations for substantial supporting evidence. Gov't Resp. at 10 (citing *Ward v. United States*, 89 Fed. Cl. 463, 479 (2009)). This is, of course, the appropriate standard, *see, e.g., Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006), so the Court's task is to determine whether substantial evidence supports the Air Force's determination that Plaintiff is not totally disabled.

Plaintiff refers the Court to numerous records in support of her contention that she is totally disabled. For example, the 2006 Functional Capabilities Evaluation, which stated that Plaintiff "does not demonstrate the physical ability to work even at the sedentary level of physical demand in a competitive work environment." AR 739. She points the Court to her 2007 WRT, which according to Plaintiff demonstrates her "7th grade reading level."[3] She also cites a number of records that tend to indicate that she is unable to work.

Meanwhile, the Government notes that the Air Force relied on the 2008 and 2009 TDRL exams when it noted that Plaintiff had not been seen for her back condition since 2005 (from the 2008 TDRL) and that her symptoms are controlled with medicine and activity modification (from the 2009 TDRL). *See* AR 13. The Government also points the Court to numerous contradicting citations not repeated here, some of which suggest that Plaintiff could not work while other suggest that she could. *See* Gov't Resp. at 11-12.

With respect to Plaintiff's physical ability to work, the Government is correct that there is significant conflicting evidence as to the severity of Plaintiff's impairments. Plaintiff accurately describes records that would indicate total disability. *See, e.g.,* AR 459 ("This back condition ... would be enough in itself to prevent her from being gainfully employed."); AR 608 (Plaintiff "is not a candidate for competitive employment."). In contrast, the Government has pointed to records that militate towards the opposite conclusion. *See, e.g.,* AR 464 (Plaintiff "demonstrated the ability to perform 'sedentary' level work tasks on an intermittent basis."); AR 640 (Plaintiff's condition "is medically managed with periodic non steroidal anti-inflammatories which provide her reasonable analgesia."); AR 19-21 (noting that Plaintiff's symptoms are controlled, her

---

[3] In its opinion denying Plaintiff's motion to supplement the record, the Court observed that this statement selectively misrepresents the record. *See* Docket No. 22 at 7.

spine's range of motion is not limited, she scored 5 out of 5 on all strength tests, and "there is a possibility that she would be able to perform predominantly administrative duties.").

Plaintiff complains that the Air Force failed to explain why it relied more heavily on the 2010 TDRL exam than on the evidence she presented. To the contrary, the FPEB explained that "the objective evidence of the record, her current TDRL, the documented ability to perform activities of daily living/instrumental activities of daily living, low impact exercise, and engage in recreational pursuits do not substantiate a total disability rating and a finding that Colonel Sieben is unemployable." AR 13. Thus, the FPEB explained that, in light of all the evidence, it could not conclude that Plaintiff was totally disabled, even if some of the evidence tended to show that she was.

The Court concludes that there is sufficient information contained within the record, and referred to by the board, to support the determination that she is not totally disabled. While this Court may have weighed the evidence differently, that is not its role here. *See Thompson v. United States*, 14 Cl. Ct. 702, 705 (1988) ("The court does not sit as a super correction board.") (citing *Skinner v. United States*, 219 Ct. Cl. 322, 330-31, 594 F.3d 824, 829-30 (1979)). Where, as here, there is substantial evidence to support the Air Force's conclusions, the Court leaves those conclusions undisturbed. *See Heisig*, 719 F.2d at 1157.

### ii. 38 C.F.R. § 3.321(b)

Pursuant to Air Force policy, "extra-schedular ratings commensurate with the average earning capacity impairment due exclusively to service-connected disability may be assigned." *Policy Memorandum*, ¶ E7.4. This provision of the *Policy Memorandum* refers to 38 C.F.R. § 3.321(b), upon which Plaintiff relies to argue that she is entitled to a 100 percent rating because "[h]er earning capacity has gone from substantial to zero." Pltf. Reply at 9. Though she does not expressly say it, presumably Plaintiff believes that the records just discussed support her claim of zero earning capacity.

The flaw in Plaintiff's argument is that ¶ E7.4 applies in "unusual cases not covered by the VASRD." It also requires that "[t]he basis of the conclusion that the case presents such an exception or unusual disability picture that the regular VASRD standards do not apply must be documented." As described in Section III.b.i, *supra*, the findings of the FPEB and SAFPC are supported by substantial evidence. Those findings leave no space for a finding that this is an exceptional case. Thus, the Court concludes, for essentially the same reasons as stated above, that 38 C.F.R. § 3.321(b) and *Policy Memorandum* ¶ E7.4 do not require a rating of 100 percent in this case.

### iii. 38 C.F.R. § 4.16(a)

Finally, Plaintiff argues that the SAFPC noted her pain, strength issues, low back dysfunction, loss of lumbar extension, trunk weakness, asymmetric weakness and balance issues,

but rated only her ataxic[4] gait under the VASRD. Pltf. Mot. at 39. Pursuant to 38 C.F.R. § 4.7, Plaintiff argues that the Air Force should have rated her for all of her impairments, and in doing so, it should have "appl[ied] the highest rating that more nearly approximates her condition." *Id.* at 40. She takes the position that her functional loss, back pain and leg condition should have been rated in addition to the rating she received under the "spine" provision of the VASRD. She also argues that the Air Force failed to properly rate her under the "spine" provision. Finally, she argues that her PTSD and TBI are ratable conditions.

### 1. Functional Loss and Joint Issues

Plaintiff contends that she should have been rated pursuant to two additional provisions of the VASRD, namely the "functional loss" provision, 38 C.F.R. § 4.40, and the "joints" provision, 38 C.F.R. § 4.45. Plaintiff claims that her pain, weakness, hypermobility and other issues should result in assignment of a higher rating based on her functional loss.

Although it is not controlling, *Mitchell v. Shinseki*, 25 Vet. App. 32 (2011), contains a well-reasoned discussion on the interaction of the two provisions cited by Plaintiff. After a rather extensive, and persuasive, analysis of both §§ 4.40 and 4.45, plus relevant precedent, the Court of Appeals for Veterans Claims determined that "pain itself does not rise to the level of functional loss as contemplated by the VA regulations." *Id.* at 38. Instead, pain may result in functional loss "only if it limits the ability 'to perform the normal working movements of the body with normal excursion, strength, speed, coordination[, or] endurance.'" *Id.* (citing 38 C.F.R. § 4.40).

The FPEB's decision recognized that Plaintiff tested as five out of five on all strength tests and that she is able to perform aerobic exercises several times per week. AR 10, 20. Although her records reflect the possibility that Plaintiff may not have the endurance she would have without the condition, *see, e.g.*, AR 464 (Plaintiff "demonstrated the ability to perform 'sedentary' level work tasks on an intermittent basis."), other records show that whatever pain she may have is not likely to give rise to a functional loss. AR 640 (Plaintiff's condition "is medically managed with periodic non steroidal anti-inflammatories which provide her reasonable analgesia."); AR 19-21 (noting that Plaintiff's symptoms are controlled, her spine's range of motion is not limited, she scored 5 out of 5 on all strength tests, and "there is a possibility that she would be able to perform predominantly administrative duties.").

In light of the decisions of the FPEB and SAFPC, and the bases for same, the Court is compelled to find that Plaintiff is not entitled to a rating for functional loss. As already discussed, the decisions of the Air Force are supported by substantial evidence, and those decisions simply cannot be reconciled with a finding of functional loss. The Court, therefore, finds that there was no error in failing to assign to Plaintiff a functional loss rating.

### 2. Spine Rating

---

[4] "Ataxic," a synonym of "atactic," means "lacking coordination; irregular; pertaining to or characterized by ataxia." DORLAND'S at 170-71. "Ataxia," in turn, means "failure of muscular coordination; irregularity of muscular action." *Id.* at 170.

Plaintiff also complains that she was entitled to an additional 20 percent rating based on her spinal range of motion. Pltf. Mot. at 41-42. From her calculations, Plaintiff concludes that she is entitled to a minimum rating of 20 percent for her limited range of motion. She supports her position by reference to her 2009 TDRL exam, wherein she claims her range of motion was measured to 115 degrees. Pltf. Mot. at 41 (citing AR 599-600). A combined range of motion under 120 degrees is entitled to a 20 percent rating. 38 C.F.R. § 4.71a, The Spine.

The Government estimates that, in reaching her calculation of 115 degrees, Plaintiff evidently averaged the several ranges of motion in her test (flexion, extension, L lateral flexion and R lateral flexion), rounded each result to the nearest five degrees pursuant to 38 C.F.R. § 4.71a, The Spine, Note 4, treated her forward flexion as 90 degrees despite testing at 120-124 degrees,[5] and added the totals. The Government notes that its calculations result in a 120 degree range of motion, and the Court agrees that the total of the average ranges is 120 degrees.[6] However, it appears to the Court that Plaintiff ignored the evidence that went against her and performed her calculations only on the last two tests, which had smaller ranges than the first.

Entirely aside from Plaintiff's unclear or incomplete calculations, the Government notes that Plaintiff's calculations are incomplete because they fail to account for her left and right rotation, which were not tested during the 2009 TDRL exam. See AR 600. The combined range of motion is "the sum of the range of forward flexion, extension, left and right lateral flexion, and *left and right rotation.*" 38 C.F.R. § 4.71a, The Spine, Note 2 (emphasis added). These values were not calculated at the exam because Plaintiff reported to her examiner that she was under instructions to avoid spinal rotation. Thus, two of six ranges are not represented in Plaintiff's calculations. Although there are no contemporaneous reports of her rotation range, Plaintiff tested at 30 degrees in 2008. Thus, the Government suggests that Plaintiff is most likely in the range of "greater than 120 degrees but not greater than 235 degrees," which could justify a 10 percent rating. See Gov't Resp. at 4.

---

[5] This calculation was made pursuant to 38 C.F.R. § 4.71a, The Spine, Note 2, which provides that no measurement may go beyond the normal range, and which also provides that 90 degrees is the normal range for flexion.

[6] For ease of reference, the Court has reproduced the relevant data in table form here, with the first three columns representing the data, the fourth column representing the Court's calculated average, and the fifth representing the "rounded" value:

|  | 1 | 2 | 3 | Avg | Rounded |
|---|---|---|---|---|---|
| Flexion | 124 | 121 | 120 | 121.6 | 120 (90) |
| Extension | 12 | 9 | 10 | 10.3 | 10 |
| L Lateral Flexion | 5 | 5 | 7 | 5.6 | 5 |
| R Lateral Flexion | 15 | 12 | 12 | 13 | 15 |

With these averaged numbers, the total is 120 degrees.

The Government goes a step further, though, arguing that *even if* Plaintiff could justify the 20 percent rating she seeks, that would not entitle her to additional benefits because "[m]ultiple reasons to rate a spinal condition at 20 percent do not entitle a servicemember to a higher rating." *Id.* (citing *Cullen v. Shinseki*, 24 Vet. App. 74, 84 (2010)). The *Cullen* Court held that "within a particular diagnostic code, a claimant is not entitled to more than one disability rating for a *single disability* unless the regulation expressly provides otherwise. To find otherwise would permit absurd results – compensation twice for the same condition – and not only in the case of diseases and injuries of the spine." *Cullen*, 24 Vet. App. at 84. This Court finds sound the concern in *Cullen* over the potential for a plaintiff to double-dip, and as such, the Court finds that one 20 percent rating – whether the one arrived at by the SAFPC or by Plaintiff's calculations – is the appropriate rating for Plaintiff's spinal condition.

### 3. Leg Condition

Plaintiff also claims that she is entitled to a rating for her leg condition. She points to portions of the AR which demonstrate that she has an ataxic gait, left leg weakness, abnormal posturing, spasticity, trips and falls, and an MRI showing nerve impingement. Pltf. Mot. at 42. The extent of her argument is that "[t]he VA rates this condition as intermittent radiculopathy and the defendant should have rated it in addition to, not in lieu of, plaintiff's spine condition." *Id.*

In response, the Government argues that there is substantial evidence which shows that Plaintiff does not have nerve damage in her left leg. For example, in 2008, it was observed that she was rated at "5 out of 5 bilaterally" for strength and had normal for increased reflexes in her left leg. AR 641. The 2009 TDRL exam showed similar results. *See* AR 597. She did have some spasticity during testing in 2009, but that spasticity was attributed to "[q]uestional poor effort vs. lack of cooperation." *Id.* Likewise, a civilian exam from 2010 shows no neurological problems. AR 462 (finding a "negative neurological evaluation."). Moreover, the Air Force notes that it is able to reach different ratings than the VA.

Once more, the Court sides with the Government. While there are some indications of potential neurological concerns, *see* AR 573 (2009 TDRL reflecting reduced reflexes and decreased strength), there is substantial evidence that rating Plaintiff for her radiculopathy would be inappropriate. The Court will not disturb the Air Force's rating in such a case.

### 4. PTSD and TBI

Although she claims entitlement to a rating for PTSD and TBI, these conditions (to the extent that she has received either diagnosis) are not compensable. To be compensable, a condition diagnosed while on the TDRL must have been unfitting at the time the service member was placed on the TDRL, or otherwise resultant from the condition for which the member was placed on the TDRL. *See* DoDI 1332.38 at ¶ E3.P6.2.4. The SAFPC notes that the evidence showed that Plaintiff's PTSD was satisfactorily controlled by medication, and was therefore not unfitting. AR 7. It also noted that there were no records of TBI at the time Plaintiff was placed on the TDRL, but that all evidence indicated that any possible TBI was not unfitting at the time

she was placed on the TDRL. AR 7-8. Thus, neither Plaintiff's PTSD nor her TBI are compensable by the Air Force.

## IV. Conclusion

For the foregoing reasons, the Government's motion for judgment on the administrative record is GRANTED, and Plaintiff's cross-motion for judgment on the administrative record is DENIED. The Clerk is directed to enter judgment accordingly.

EDWARD J. DAMICH
Judge

# PROOF OF SERVICE

I, HARRY A. SIEBEN, certify under penalty of perjury that on this 19th day of July, 2013 a copy of the following documents:

- Appellant's Brief and Addendum

was filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Joshua A. Mandlebaum
US DOJ – Civil Division, Commercial
Litigation Branch (POB)
P.O. Box 480
Ben Franklin Station
Washington DC  20044
(202) 305-3091
joshua.a.mandlebaum@usdoj.gov


/s/ Harry A. Sieben, Jr.
Harry A. Sieben, Jr.

*Attorney for Plaintiff-Appellant*
*Mary V. Sieben*

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.  This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    - this brief contains 8,684 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2.  This brief complies with the typeface requirements of the Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    - this brief has been prepared in a proportionally spaced typeface, using Microsoft Word 14 Times New Roman font.

Dated: July 19, 2013

/s/ Harry A. Sieben, Jr.
Harry A. Sieben, Jr.

*Attorney for Plaintiff-Appellant*
*Mary V. Sieben*